# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Charles P. Nelson and Darlene F. Nelson, on behalf of themselves and all others similarly situated,

**Civil File No: 13-cv-607 SRN/SER**

          Plaintiffs,

v.

American Family Mutual Insurance Company,

**REPORT AND RECOMMENDATION**

          Defendant.

---

     Bert Black, Bryce M. Miller, Lawrence P. Schaefer, Esqs. Schaefer Law Firm, 400 South Fourth Street, Suite 202, Minneapolis, Minnesota 55415, for Plaintiffs.

     Richard J. Fuller, Esq., 17722 Lever Street, Ham Lake, Minnesota 55304, for Plaintiffs.

     Aaron D. Van Oort, Christina C.K. Semmer, Deborah A. Ellingboe, Amanda J. Rome, Esqs., Faegre Baker Daniels LLP, 90 South Seventh Street, Suite 2200, Minneapolis, Minnesota 55402, for Defendant.

---

STEVEN E. RAU, United States Magistrate Judge

     The above-captioned case comes before the undersigned on Plaintiffs Charles P. Nelson and Darlene F. Nelson's (collectively, the "Nelsons") Motion for Remand [Doc. No. 15] and Defendant American Family Mutual Insurance Company's ("American Family") Motion to Dismiss Plaintiffs' Class Action Complaint ("Motion to Dismiss") [Doc. No. 7]. These Motions have been referred to the undersigned for a Report and Recommendation ("R&R") pursuant to 28 U.S.C. § 636(b)(1)(A), (B), and (C) and District of Minnesota Local Rule 72.1. (Order of Reference Dated Apr. 15, 2013) [Doc. No. 18]. For the reasons stated below, the Court

recommends that American Family's Motion to Dismiss be granted in part and denied in part, and that the Nelsons' Motion to Remand be denied.

## I.    BACKGROUND

### A.    Factual Background

American Family, a Wisconsin company, sells homeowners insurance policies throughout Minnesota.  (Class Action Compl., the "Complaint" or "Compl.," Ex. A ¶¶ 1, 10, Attached to the Notice of Removal) [Doc. No. 1-1].[1]  The Nelsons are Minnesotans who are considered senior citizens under Minnesota's consumer protection laws.  (*Id.* ¶¶ 12, 14); *see also* Minn. Stat. § 325F.71, subdiv. 1.  They purchased a Gold Star Homeowners Insurance Policy (a "Gold Star Policy" or "Policy") from American Family for their new home in 1990, which they have renewed several times and remains in effect.[2]  (Compl. ¶¶ 13, 30).  The following table shows the replacement cost for the Nelsons' home under their Gold Star Policies:[3]

| Date | Home |
|------|------|
| 2004 | $184,000 |
| Feb. 1, 2007 | $415,500 |
| Feb. 1, 2008 | $427,500 |
| Feb. 18, 2009 | $439,000 |
| Feb. 1, 2010 | $450,900 |
| Feb. 18, 2011 | $454,500 |

---

[1]    Unless otherwise specified, citations to paragraphs in the Complaint refer to the paragraphs in the body of the Complaint, not the paragraphs under the "Prayer for Relief" heading on pages 17–18.

[2]    This R&R refers to the Nelsons' Gold Star Homeowner Policies collectively as the "Policies."

[3]    The Nelsons aver that the replacement cost in the Policies is synonymous with the insurable value.  (Compl. ¶ 24).

(*Id.* ¶¶ 30, 33). The Nelsons claim the replacement cost of their home in 2010 was no higher than $315,000, and was no higher than $348,297 throughout the relevant time period. (*Id.* ¶ 37).[4] The national average costs of total home reconstructions increased by no more than 15% between January 1, 2006, and December 31, 2010, less than the increases American Family imposed on the Nelsons' replacement cost.[5] (*Id.* ¶ 38). In 2011, the Nelsons complained to American Family that the estimated replacement cost for their home "greatly exceeded the actual replacement cost." (*Id.* ¶ 35). In response, American Family reduced the replacement cost to $315,000. (*Id.*). American Family did not refund any portion of the Nelsons' past premiums derived from excess coverage. (*Id.*).

American Family's estimation of the replacement cost of personal property contained within the dwelling also increased, in direct proportion to the above increases, at 80% of the replacement cost of the structure. (*Id.* ¶ 34). The Nelsons claim the personal property in their home has never been worth as much as 80% of the replacement cost of their home. (*Id.*).

The 2004 Policy, and all subsequent Polices, stated that the replacement value was "the minimum amount for which to insure [their] dwelling" to receive the full replacement cost in the event of a total loss. (*Id.* ¶ 31). The Policies also gave the Nelsons the option to select "a coverage amount equal to that appraised value . . . , [but only] if the amount is greater than the replacement cost estimated by [American Family's] residential building cost guide, and [American Family] agree[s] to that amount." (*Id.*). The Nelsons allege this means they did not

---

[4]    The Nelsons' estimates use the Miller-Swift index, "a nationally accepted and authoritative source for estimating the replacement costs of homes . . . ." (Compl. ¶ 37).

[5]    The Nelsons rely on Xactware Property Reports, a service insurance companies rely on to estimate amount replacement costs. (*Id.* ¶ 38).

have the option of having the estimated replacement cost reduced. (*Id.*).[6] The 2004 Policy and all subsequent Policies also contained a provision that allowed American Family to increase the coverage limits periodically if the insurable value of the property increased. (*Id.* ¶ 32).

Beginning at least as early as 2004, the Nelsons' Gold Star Policies included statements regarding the insurable value of insured structures, as Minnesota law required. (*Id.* ¶ 23); *see also* Minn. Stat. § 65A.01, subdiv. 3. A Gold Star Policy is a replacement cost policy, and therefore, the "'insurable value' cannot exceed the 'replacement cost' of buildings and other improvements on a piece of property." (*Id.* ¶ 24); *see also* Minn. Stat. 65A.09, subdiv. 1.

The Nelsons allege that American Family's estimates of insurable value exceed the actual replacement costs, especially when polices are renewed. (*Id.* ¶ 25). These insurable value estimates induced customers to purchase "unnecessary excess coverage." (*Id.*). The Nelsons claim American Family knew or should have known that its estimates of insurable value or replacement cost for insured homes "did not comply with appraisal industry standards and could be expected on numerous occasions to result in excessive value estimates." (*Id.* ¶ 26). Additionally, American Family typically "estimates that the replacement cost of all personal property contained in an insured dwelling at approximately 80% of the replacement cost of the dwelling for the [P]olicy year . . . ." (*Id.* ¶ 27). American Family does not ask customers renewing their Policies whether there have been any changes to the "existence, nature, or age of personal property." (*Id.*). The Nelsons allege that American Family therefore increases Policy

---

[6]     Although American Family reduced the estimated replacement cost in 2011 at the Nelsons' request (*see* Compl. ¶ 35), this paragraph of the Complaint appears to address to the fact that although the Policy provides for a methodology for the replacement cost to be increased, there is no corresponding methodology in the Policy for the replacement cost to be reduced. (*Id.* ¶ 31).

coverage beyond the actual replacement cost, and customers must pay for more insurance than what they require or "can derive a benefit from." (*Id.*).

The Nelsons claim that, because of American Family's conduct, they—and other Minnesotans—purchased insurance coverage for their homes and the personal property in their homes above the insurable value or replaceable cost of the property. (*Id.* ¶ 28). Because they paid for excess coverage, they paid insurance premiums for "coverage that is higher than allowed by Minnesota law, and/or for coverage that provides illusory benefits." (*Id.* ¶ 28). Gold Star Policies automatically update "the replacement cost of the insured property" each time the Policy is renewed. (*Id.* ¶ 1). The Nelsons allege the increases to the replacement cost of their home and its contents create estimates greater than the actual replacement cost. (*Id.*). This then induced them to buy "unnecessary and excessive coverage" and pay higher premiums associated with the excessive coverage. (*Id.* ¶ 39). As a result, the Nelsons allege their damages are approximately $3,500, and that they will continue to suffer damages as long as American Family insures their home and its contents. (*Id.*).

The Nelsons brought suit on behalf of themselves and two putative classes. (*Id.* ¶¶ 40–41). The Nelsons seek injunctive and declaratory relief for the following class: "Class I: All residents of Minnesota who currently hold a Gold Star Policy from American [Family] covering residential property located in Minnesota and/or the personal property of such residential property." (*Id.* ¶ 41). For ease of reference, this R&R will refer to "Class I" as the "Injunctive Class." The Nelsons seek monetary damages for prior excessive premium payments for the following class:

> Class II: All residents of Minnesota who renewed a Gold Star Policy from American [Family] covering residential property located in Minnesota (and/or the personal property contents of such residential property), at any time after a date six (6) years prior to the commencement of this action, in connection with which,

American [Family] charged premiums based on a subsequent estimate of the replacement cost of the dwelling and its contents, and who:

    a.        were over the age of 62 at the time of any renewal during the relevant period; and

    b.        were provided an estimate of the replacement value of their property that exceeded by more than 10% the value that would have been obtained using the Miller-Swift index.

(*Id.* ¶ 41). For ease of reference, this R&R will refer to "Class II" as the "Damages Class."

Based on these facts, the Nelsons allege American Family is liable to the Injunctive Class for engaging in a deceptive trade practices as defined in Minnesota Statutes sections 72A.20 and 325D.44. (*Id.* ¶¶ 48–55). The Nelsons allege American Family is liable to the Damages Class for unlawful conduct under Minnesota Statutes sections 325F.69, 325F.71, and 8.31, subdivision 3a, and, in the alternative, for unjust enrichment and negligence per se. (*Id.* ¶¶ 56–65).

### B.    Procedural History

The Nelsons filed their Complaint in Hennepin County on January 30, 2013. (Compl.). American Family removed the case to this District on March 15, and filed its Motion to Dismiss the following week. (Notice of Removal) [Doc. No. 1]; (Mot. to Dismiss). The Court dismissed Michael Rothman, Minnesota Commissioner of Commerce, pursuant to the parties' stipulation. (Order Dated Mar. 29, 2013) [Doc. No. 13]. The Nelsons filed their Motion to Remand in mid-April. (Mot. to Remand). The undersigned heard oral argument on both Motions on June 13, 2013. (Minute Entry Dated June 13, 2013) [Doc. No. 31].

## II.    MOTION TO REMAND

The Motion to Remand, if granted, would relieve this Court of jurisdiction, and is therefore dispositive. *See Haag v. Hartford Life & Accident Ins. Co.*, 188 F. Supp. 2d 1135,

1136 (D. Minn. 2002) (DSD/JMM).[7]  For this reason, the Court addresses the Motion to Remand first, followed by the Motion to Dismiss.

American Family timely removed this case from Minnesota's Fourth Judicial District to this District under the Class Action Fairness Act ("CAFA").  (Compl.); (Notice of Removal ¶ 7).  The Nelsons argue class damages are less than $5 million, the jurisdictional requirement for removal of class actions under CAFA, and therefore the Court should remand the case back to state court.  (Pls.' Mem. of Law in Supp. of Mot. for Remand, "Nelsons' Remand Mem.") [Doc. No. 17 at 4]; *see also* 28 U.S.C. § 1332(d)(2).

## A.    Legal Standard

CAFA implemented an important change to federal diversity jurisdiction, conferring jurisdiction over class actions where "1) there is minimal diversity; 2) the proposed class contains at least 100 members; and 3) the amount in controversy is at least $5 million in the aggregate."  *Raskas v. Johnson & Johnson*, 719 F.3d 884, 886–87 (8th Cir. 2013) (internal quotations and citations omitted); *see also* Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.).  When a defendant properly removes a class action case to federal court, "CAFA should be read broadly, with a strong preference that

---

[7]     In the past, this District has concluded a motion to remand is not dispositive.  *See, e.g.*, *Dyrda v. Wal-Mart Stores, Inc.*, 41 F. Supp. 2d 943, 645 (D. Minn. 1999) (DDA/AJB); *Banbury v. Omnitrition Int'l, Inc.*, 818 F. Supp. 276, 279 (D. Minn. 1993) (DSD/FEB).  But more recent cases from this District, and the Courts of Appeals that have considered the matter, have found that a motion to remand is dispositive.  *See, e.g.*, *Garland v. Mortg. Elec. Registration Sys., Inc.*, Civil Nos. 09–71 (JNE/JJG), 09–72 (JNE/JJG), 09–342 (JNE/JJG), 09–430 (JNE/JJG), 2009 WL 1684424, at *1 n.1 (D. Minn. June 16, 2009); *Haag*, 188 F. Supp. 2d at 1136; *Abfalter v. Scott Cos., Inc.*, No. 01-cv-1173 (ADM/AJB), 2001 WL 1517035, at *1 (D. Minn. Nov. 27, 2001); *see also Vogel v. U.S. Office Prods. Co.*, 258 F.3d 509, 517 (6th Cir. 2001); *First Union Mortg. Corp. v. Smith*, 229 F.3d 992, 996 (10th Cir. 2000); *In re U.S. Healthcare*, 159 F.3d 142, 146 (3d Cir. 1998).

interstate class actions should be heard in a federal court . . . ." *Hargis v. Access Capital Funding, LLC*, 674 F. 3d 783, 789 (8th Cir. 2012) (internal quotations and citations omitted).

The parties do not dispute that they are diverse or that the class contains at least 100 members. Instead, the parties disagree about whether the amount in controversy reaches the $5 million threshold. *See* (Nelsons' Remand Mem. at 4). Because American Family seeks to invoke federal jurisdiction through removal, it has the burden to prove—by a preponderance of the evidence—that the amount in controversy is greater than $5 million. *Bell v. Hershey Co.*, 557 F.3d 953, 956 (8th Cir. 2009). Under this standard, American Family need not show that damages *are* greater than $5 million. *Id.* at 959. Instead, it must show that "a fact finder *might* legally conclude that they are." *Id.* (internal quotations and citations omitted). This burden is "a pleading requirement, not a demand for proof." *Hartis v. Chicago Title Ins. Co.*, 694 F.3d 935, 944–45 (8th Cir. 2012). Jurisdiction is measured either at the time of the complaint or the time of removal, "even though subsequent events may remove from the case the facts on which jurisdiction was predicated." *Hargis*, 674 F.3d at 789 (internal quotations and citations omitted).

If American Family establishes, by a preponderance of the evidence, that the amount in controversy is $5 million or more, the burden then shifts to the Nelsons, who must show that it is legally impossible to recover more than $5 million. *Bell*, 557 F.3d at 959. An amount in controversy that may be highly improbable does not satisfy the standard of legally impossible. *Raskas*, 719 F.3d at 888. A legal certainty cannot include an estimate. *Zellner-Dion v. Wilmington Fin., Inc.*, No. 10-cv-2587 (PJS/JSM), 2012 WL 2952251, at *5 (D. Minn. July 19, 2012).

### B. Analysis

#### 1. American Family's Burden

The Nelson's Complaint does not allege a dollar-amount of damages for either class. (Compl. at 17–18 (Prayer for Relief)); (Nelsons' Remand Mem. at 8). The Nelsons allege they "have paid approximately $3,500 more than they would have paid if the replacement cost of their home and its contents had been properly determined." (Compl. ¶ 58). As class representatives, the Nelsons allege that their fellow class members have suffered similar harm, that their claims are typical of the claims of both classes, and that "all class members sustained similar damages . . . ." (Compl. ¶¶ 42, 44). The Nelsons allege class damages do not exceed $4 million and they will not seek fees more than 25% of class damages. (*Id.* ¶ 43).

American Family claimed that removal was proper because, based on its estimates, the Nelsons' Complaint alleged at least $23.5 million in controversy. (Notice of Removal at 5). The Nelsons argue remand is appropriate because American Family has not established that $5 million is in controversy. (Nelsons' Remand Mem. at 4).

##### a. The Pitz Declaration

In support of its Notice of Removal, and perhaps in anticipation of the Nelsons' Motion, American Family filed a declaration by Jordan Pitz, an actuary and pricing manager for homeowner lines at American Family. (Decl. of Jordan Pitz in Supp. of Notice of Removal, "Pitz Decl." or "Pitz Declaration") [Doc. No. 2 ¶ 1]. Relying on his personal knowledge and his position, Pitz testified that he is "familiar with American Family's records regarding Gold Star homeowner's policies insuring properties in Minnesota." (*Id.*). Using a series of estimations and calculations, Pitz estimated that the amount in controversy exceeded $5 million. *See generally* (*id.*).

First, Pitz estimated the amount of premiums that are attributable to increases in the replacement value of insured homes during the class period. (*Id.* ¶ 3). The class period is six years prior to the filing of the Complaint. (*Id*. ¶ 2); (Compl. ¶ 41). American Family refers to the replacement value of an insured home as the "Coverage A" amount. (Pitz Decl. ¶ 3). Pitz estimated that Coverage A increased between 0.9% and 6.6% per year during the class year. (*Id.*). Pitz testified that Coverage A increases account for approximately 70% of an increase in Policy premiums. (*Id.*). Therefore, Pitz concluded the percentage of a premium increase that was attributed to an increase in Coverage A ranged from approximately 0.6% (0.9% times 70%) to 4.6% (6.6% times 70%). (*Id.*).

To convert this percentage to dollar figures, Pitz looked at "the amount of premiums written for Gold Star policies in Minnesota." (*Id.* ¶ 4). This amount totaled nearly $880 million between 2006 and 2011, and varied from $130 million to no more than $165 million per year. (*Id.*). Although data was not available regarding Gold Star Policies' renewal rate, Pitz estimated that 95% of all types of policies were beyond their first year with American Family, and Pitz did not expect that figure to vary if Gold Star Policies could be separated from other types of policies. (*Id.*). Using these figures, Pitz estimated that American Family collected $18 million "in premiums related to Coverage A increases for *all* Minnesota Gold Star [P]olicies in the last six years." (*Id.* ¶ 5).[8] Pitz reviewed data from owner policies, and estimated that 30% of

---

[8]      The Pitz Declaration does not detail exactly how he used the numbers in paragraph four to reach $18 million. But some rudimentary math shows that the number is within the range described in paragraph four. Pitz estimated that American Family wrote $880 million in Gold Star Policy premiums from 2006 to 2011. (Pitz Decl. ¶ 4). Of these, 95% had been renewed at least once. (*Id.*). Therefore, $836 million is the amount of Gold Star premiums that had been renewed ($880 million times 95%). The premium increase attributable to Coverage A increases varied from 0.6% to 4.6%. (*Id.* ¶ 3). Applying the $836 million figure to this percentage, the Court finds that the amount of premiums attributable to Coverage A increases in Gold Star

American Family's insureds are above age 62. (*Id.* ¶ 4). Therefore, insureds above the age of 62 paid about $5.5 million in premiums related to Coverage A increases.[9] (*Id.* ¶ 5); (Am. Family's Mem. of Law Opposing Pls.' Mot. for Remand, "Am. Family's Remand Opp'n") [Doc. No. 24 at 4]. American Family does not have a license for the Marshall-Swift index, so Pitz was unable to calculate what amount of the premiums were paid for replacement valuations that exceeded the Marshall-Swift index. (Pitz Decl. ¶ 6).

Pitz testified that more than 150,000 American Family customers in Minnesota purchased Gold Star Policies, and that he estimates over 45,000 of those policies "were purchased by Minnesotans over the age of 62." (*Id.* ¶ 7).

Finally, Pitz testified that a conservative estimate of premiums attributed to increases in replacement costs in the next six years is equal to that of the last six years. (*Id.* ¶ 8). But because insurance costs are generally increasing over time, the amount is likely to be higher. (*Id.*). Therefore, Pitz estimates that "at least $18 million will be collected in premiums for Gold Star homeowners policies because of increases in replacement value, and at least $5.5 million of that amount will be paid by policyholders of age 62 or older." (*Id.*).

b. **Damages Estimates**

Pitz estimates that American Family Minnesota insureds who have Gold Star policies and are over the age of 62 paid approximately $5.5 million in premiums attributable to Coverage A,

Policies ranged from $5.016 million ($836 million times 0.6%) to $38.456 million ($836 million times 4.6%). Pitz's estimate that American Family collected $18 million in premiums related to the Coverage A increases for all Gold Star Policies falls well within the range of these calculations. *See* (*id.* ¶ 5).

[9] The Court's calculations yield $5.4 million in premiums paid by Minnesotans over the age of 62 attributable to Coverage A increases: $18 million (premiums related to Coverage A increases for all Gold Star policies) times 30% (American Family insureds older than age 62). But this difference is not material.

or replacement cost, increases. (*Id.* ¶ 5). This calculation purports to represent the potential damages suffered by the Damages Class. (Notice of Removal ¶ 9). The Nelsons point out that Pitz's calculations do not take into account that American Family may have increased coverage greater than 10% of the value under the Miller-Swift index, a characteristic that applies to Damages Class members as currently defined. (Nelsons' Remand Mem. at 4). But the standard at this stage is not "a demand for proof[;]" instead, American Family must show what damages a fact finder might legally conclude are available. *Hartis*, 694 F.3d at 944–45; *Bell*, 557 F.3d at 959. The Court's task is to "discern the outer boundary of what the plaintiff class could recover—the defendant's worst-case scenario . . . ." *Zellner-Dion*, 2012 WL 2952251, at *3. American Family is not required to use the Miller-Swift index, especially because, at the "outer boundary," it is possible that every Minnesotan over the age of 62 paid increased premiums that are attributable to Coverage A increases *also* had increased coverage that was greater than 10% of the value under the Miller-Swift index. (Am. Family's Remand Opp'n at 7). This "worst-case scenario" for American Family would result in $5.5 million in damages for the Damages Class alone.

But the Nelsons also purport to represent the Injunctive Class, consisting of Minnesotans who currently have Gold Star Policies from American Family that cover their residential property and the personal property of the residential property. (Compl. ¶ 41). "[I]n a suit for declaratory judgment or injunctive relief[,] the amount in controversy is the value to the plaintiff of the right that is in issue." *Usery v. Anadarko Petroleum Corp.*, 606 F.3d 1017, 1018–19 (8th Cir. 2010) (citations omitted). Pitz calculated that $18 million in premiums attributable to Coverage A increases were collected over the past six years (Pitz Decl. ¶ 5), and that this amount would continue or increase in the future. (*Id.* ¶ 8). Therefore, if a fact finder awarded the

Nelsons injunctive relief, American Family values this relief at $18 million for the Injunctive Class.  (Notice of Removal ¶ 9).

Adding the monetary damages that a fact finder could award the Damages Class ($5.5 million) to the value of the injunctive relief a fact finder could award the Injunctive Class ($18 million) yields a total amount in controversy of $23.5 million.  (Notice of Removal ¶ 9).  Pitz has the actuarial and pricing experience at American Family to be able to make the estimates to which he testifies in his declaration.  (Pitz Decl. ¶ 1).  American Family has determined that the outer boundary of damages the Nelsons and the putative classes seek leaves them open to $23.5 million worth of liability.  (Am. Family's Remand Opp'n at 7).  Therefore, American Family has met its burden to show, by a preponderance of the evidence, that the damages in this case might exceed CAFA's jurisdictional requirement $5 million.

### c.    Limitations of the Class Definitions

American Family argues the Nelsons artificially limit the Damages Class to policyholders older than age 62, in violation of the Supreme Court's recent decision in *Knowles.*  (Am. Family's Remand Opp'n at 12–16 (referring to *Standard Fire Ins. Co. v. Knowles*, 133 S. Ct. 1345 (2013)).  American Family argues under *Knowles*, the Nelsons cannot avoid federal jurisdiction by arbitrarily limiting the class definition.  (*Id.* at 14).  Absent the artificial limitations, American Family estimates its damages in this case to be approximately $36 million: $18 million in damages for all Minnesota Gold Star Policy holders who paid increased premiums as a result of Coverage A increases (as opposed to limiting the class to only policyholders age 62 and older), and $18 million dollars as the value of the injunctive relief.  (*Id.* at 16).

The Court expressed concern regarding this class limitation at oral argument.  But because the amount in controversy exceeds $5 million even when taking the definition of the

Damages Class at face value as described in the Complaint, this matter does not need to be addressed in order to resolve the instant Motion to Remand.

### d. Attorney's Fees

The Complaint also requests reimbursement for costs and reasonable attorney's fees. (Compl. at 18). Although not substantively discussed by either party, both parties note that attorney's fees may be included in a damages estimate, and that, at this time, the amount of attorney's fees is unknown. (Notice of Removal ¶ 9); (Nelsons' Remand Mem. at 8 n.4). Like the class definition issue, the Court does not address this because the Court finds the amount in controversy reaches the jurisdictional threshold without taking attorney's fees into consideration.

### 2. The Nelsons' Burden

Because the Court finds that American Family has met its burden, the burden now shifts to the Nelsons, who must show that it is legally impossible for the damages sought to reach the jurisdictional threshold of $5 million. *See Bell*, 557 F.3d at 959. The Nelsons allege that they have suffered $3,500 in damages (Compl. ¶¶ 39, 58), and "specifically den[y] that all class members have suffered damages equal to the Nelsons[,]" because the qualities and attributes of the various dwellings vary so greatly that damages would not be identical. (Nelsons' Remand Mem. at 8). But because this is a class action case, the Nelsons also allege, as they must, that they suffered similar harm as other class members, and that "all class members sustained similar damages arising out of the same wrongful conduct." (Compl. ¶¶ 42, 44).

### a. The Damages Class

The Nelsons essentially argue about Pitz's calculations and assumptions, asking the Court to second-guess the estimate of an American Family employee with personal knowledge. Specifically, the Nelsons state that American Family incorrectly concluded "that *all* premium

increases attributable to replacement cost increases would go to damages[,]" which they claim is inaccurate because "[d]amages are not all premium increases but only that part attributable to the overestimate of replacement cost." (Nelsons' Remand Mem. at 10). But the Pitz Declaration controls for this limitation. Pitz estimated that Coverage A, the replacement cost, increased at a rate that varied from as low as 0.9% to as high as 6.6% during the class period. (Pitz Decl. ¶ 3). He estimated that in a Policy premium, 70% of the premium amount is attributable to the increase in Coverage A. (*Id.*). Using these numbers, he concluded that a Coverage A increase resulted in an increase in a premium from about 0.6% to 4.6%. (*Id.*). Thus, this percentage represents only the amount of premium increases that Pitz estimates can be attributed to Coverage A increases.

The Nelsons further claim that Pitz's estimate is not limited to those Coverage A increases that increase the replacement cost greater than 10% of the Marshall-Swift index. (Nelsons' Remand Mem. at 10–11). But as explained above, American Family does not have access to that index, and therefore, it cannot further limit its calculations by considering it. (Pitz Decl. ¶ 6). Additionally, American Family is entitled to presume the worst-case scenario: that *every* Minnesotan age 62 or older who has a Gold Star Policy had a Coverage A amount greater than 10% of the Marshall-Swift Index. *See Zellner-Dion*, 2012 WL 2952241, at *3.

The Nelsons claim that they have alleged actual replacement costs increase only 15%, which equates to a yearly increase of 2.4%. (Nelsons' Remand Mot. at 7–8). They claim that Pitz's estimate that all Coverage A increased on average by 0.9% to 6.6% depending on the year, and this means that the total six-year increase could be as low as 3.65% (assuming 0.9% increase each year), or as high as 47% (assuming 6.6% increase each year) over the class period. (*Id.* at 11). The Nelsons argue that because American Family "does not disclose what the actual cost

increases may have been for any given year," "some customers may have been sold increased coverage that was less than American[ Family]'s purposed average increase, and thus may not be class members." (Nelsons' Remand Mem. at 11–12). But again, American Family and the Court must consider the worst-case scenario: that *all* of those customers are in fact class members.

Finally, the Nelsons assert that "American [Family] has made no evidentiary showing of how many persons were assessed higher premiums attributable to its sale of excessive coverage or the amount of those excessive premiums." (*Id.* at 12). But this is exactly what Pitz's Declaration describes: The amount of so-called excessive premiums attributable to Coverage A increases is $18 million. (Pitz Decl. ¶ 5). Of those premiums, approximately 30% were paid by Minnesotans over the age of 62, which yields an amount of $5.5 million. (*Id.*).

With respect to the number of people, Pitz estimated that 45,000 American Family customers in Minnesota have Gold Star Policies and are over the age of 62. (*Id.* ¶ 7). If the Nelsons' damages of $3,500 are truly typical of the class, the damages could reach $157.5 million ($3,500 in damages for each of the 45,000 putative Damages Class members).

### b.    The Injunctive Class

The Nelsons also argue that American Family's valuation of the injunctive relief is too speculative to support CAFA jurisdiction because it is based on the value of the premium increases for the past six years. (Nelsons' Remand Mem. at 12). But Pitz explains that he used this figure—$18 million—because he expects that future increases will "be at least equal to those of the last six years." (Pitz Decl. ¶ 8). The Complaint does not limit the time period for injunctive relief and the Court finds that Pitz's estimate that the value of injunctive relief over the next six years is as least as much as the damages would have been for the past six years, $18

million, is reasonable. As Pitz notes, the value is likely to be higher because insurance costs are increasing. (*Id.*).

The Nelsons primarily focus their Reply brief on what they perceive to be deficiencies in the Pitz Declaration. *See generally* (Pls.' Reply Mem. of Law in Supp. of Mot. for Remand) [Doc. No. 30]. But "[t]he removing party's 'burden of describing how the controversy exceeds $5 million' constitutes 'a pleading requirement, not a demand for proof. Discovery and trial come later.'" *Hartis*, 694 F.3d at 944–45 (quoting *Spivey v. Vertrue, Inc.*, 528 F.3d 982, 986 (7th Cir. 2008)). While the Nelsons may later discover, as they claim, that not all persons or premiums included in the Pitz Declaration ultimately belong in the class, the standard for jurisdiction must be based on the facts available at the time of removal. *Hargis*, 674 F.3d at 789. American Family has met its initial burden under CAFA.

### c. Legal Certainty

To successfully remand this case, the Nelsons must show that it is legally impossible for damages to reach $5 million. *Bell*, 557 F.3d at 959. The Nelsons have not introduced any facts, either in their Complaint or their briefs, that it is legally impossible for them to collect more than $5 million in damages. *See Kopp v. Kopp*, 280 F.3d 883, 885 (8th Cir. 2002) (noting that damages may "be determined to a legal certainty" where "the maximum amount of damages can often be determined . . . in cases involving liquidated damages or statutory limits on damages, or where damages are unavailable altogether."); *Zellner-Dion*, 2012 WL 2952251, at *5 (concluding that although the plaintiff engaged in the type of analysis designed to lead to a legal certainty through a more accurate estimate, an estimate cannot prove a legal certainty). "Even if it is highly improbable that the Plaintiffs will recover the amounts Defendants have put into controversy, this does not meet the legally impossible standard." *Raskas*, 719 F.3d at 888.

## C.    Recommendation

In the end, the Nelsons do not offer an expert affidavit or any evidence to contradict the Pitz Declaration.  *See, e.g.*, *Zellner-Dion*, 2012 WL 2952251, at *1–5 (considering affidavits from both plaintiff and defendant).  They simply argue that his math is wrong.  *See Amoche v. Guarantee Trust Life Ins. Co.*, 556 F.3d 41, 51 (1st Cir. 2009) ("Merely labeling the defendant's showing as 'speculative' without discrediting the facts upon which it rests is insufficient.")  The Court cannot, at this early juncture in the proceedings, make what amounts to a determination about the credibility of the Pitz Declaration when the Nelsons have not offered evidence to suggest that Pitz is not knowledgeable or qualified.  *See, e.g.*, *Lewis v. Ford Motor Co.*, 610 F. Supp. 2d 476, 484–85 (W.D. Pa. 2009) (noting that the design analysis engineer made his declaration "under penalty of perjury and based on his personal knowledge[,]" that courts have accepted similar evidence, and citing relevant cases).  Resolving the issue of the jurisdictional amount in controversy in the manner that the Nelsons suggest would require courts to engage in substantive analysis of the calculation of damages at the preliminary pleading stage.  Surely Congress did not intend that in enacting CAFA.

American Family has, through the Pitz Declaration, satisfied its burden to establish by a preponderance of the evidence that the amount in controversy in this case exceeds $5 million, the requirement for federal jurisdiction under CAFA.  The Nelsons have not met their burden to prove that it is legally impossible for them to be awarded more than $5 million.  Therefore, the Court recommends that the Nelsons' Motion to Remand be denied.[10]

---

[10]    The Nelsons claim that American Family's calculations are "so speculative that [the Nelsons] are entitled to their costs and fees for seeking remand[]" under 28 U.S.C. § 1447(c). (Nelsons' Remand Mem. at 14).  Because the Court recommends that the Motion to Remand be denied, the Nelsons' request for costs and fees need not be discussed.

### III. MOTION TO DISMISS

Because the Court finds remand is not appropriate, this R&R now addresses American Family's Motion to Dismiss for failure to state claim upon which relief can be granted. (Mot. to Dismiss); *see also* Fed. R. Civ. P. 12(b)(6).

### A. Legal Standard

In considering a motion to dismiss under Rule 12(b)(6), a court must determine whether the complaint contains "sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted)). A court accepts the facts alleged in the complaint as true, and grants "reasonable inferences in favor of the nonmoving party." *Lind v. Midland Funding, L.L.C.*, 688 F.3d 402, 405 (8th Cir. 2012). Legal conclusions "must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. Claims of fraud must be pleaded with particularity. Fed. R. Civ. P. 9(b). Required details include the "time, place[,] and contents of the false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby . . . ." *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 549 (8th Cir. 1997) (internal citations and quotations omitted).

### B. Analysis

#### 1. Counts I and II: Violations of Minnesota's Deceptive Trade Practices Act and Consumer Fraud Act

The Nelsons made claims under the Minnesota Uniform Deceptive Trade Practices Act (the "DTPA") on behalf of the Injunctive Class (Count I) and the Minnesota Prevention of Consumer Fraud Act (the "CFA") on behalf of the Damages Class (Count II). (Compl. ¶¶ 48–

60); *see also* Minn. Stat. §§ 325D.43–48 (DTPA), 325F.68–70 (CFA).[11] Under the provisions to which the Nelsons refer in the DTPA, they must allege that American Family "represented that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . ." or that it "engage[d] in . . . conduct which . . . creates a likelihood of confusion or misunderstanding." Minn. Stat. § 325D.44, subdiv. (5), (13). Under the CFA, the Nelsons must allege that American Family's actions used "fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby . . . ." Minn. Stat. § 325F.69, subdiv. 1. Given the nature of these claims, the Nelsons' Complaint is held to the heightened pleading standard described in Federal Rule of Civil Procedure 9(b). *Kinetic Co. v. Medtronic, Inc.*, 672 F. Supp. 2d 933, 944 (D. Minn. 2009) (JMR/AJB). They must therefore plead circumstances that include "the time, place[,] and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby[]" to state a claim. *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001).

The crux of American's Family argument to dismiss these claims is that the Nelsons have not pleaded their claims with the particularity required under Federal Rule of Civil Procedure

---

[11] Although various insurances statutes are also listed in Counts I and II of the Complaint, the Nelsons clarified that they do not seek to enforce those statutes. *See* (Pls.' Mem. of Law Opposing Mot. to Dismiss, "Nelsons' MTD Opp'n") [Doc. No. 14 at 4–5]. The Court therefore does not address American Family's arguments with respect to enforcement of those statutes. *See* (Am. Family's Mem. in Supp. of Mot. to Dismiss Pls.' Class Action Compl., "American Family's MTD Mem.") [Doc. No. 9 at 7–9]. This District has previously found the Minnesota legislature did not intend for the insurance statutes to bar claims against insurers under the DTPA, False Statement in Advertising Act, or the CFA "as these statutes are applied to the insurance industry." *Force v. ITT Hartford Life & Annuity Ins. Co.*, 4 F. Supp. 2d 843, 856 (D. Minn. 1998) (RHK/FLN).

9(b).  (American Family's MTD Mem. at 9–13).  Specifically, American Family argues that the Nelsons' Policies do not contain misrepresentations because they provide caveats that the estimated replacement cost may be different from the actual replacement cost and because American Family must pay the amount of coverage promised in its Policies.  (Am. Family's Mem. at 10, 12).

### a.    Misrepresentation

The relevant portion of the Policies states:

> Estimated Replacement Cost.  Our residential building cost guide may be used to develop an estimated replacement cost based on general information about your dwelling.  It is developed from researched costs of construction materials and labor rates.  This is the minimum amount for which to insure your dwelling.  The actual cost to replace your dwelling may be different.  We do not guarantee that this figure will represent the actual cost to replace your dwelling.  You are responsible for selecting the appropriate amount of coverage.  You may wish to obtain a detailed replacement cost appraisal or estimate from a contractor.  You may select a coverage amount equal to that appraised value or that cost of construction, if the amount is greater than the replacement cost as established by our residential building cost guide, and we agree to that amount.[12]

(Decl. Pages, Ex. A ("Ex. A"), Attached to Decl. of Dan Medenblik in Supp. of Am. Family's Mem. in Supp. of Mot. to Dismiss Pls.' Class Action Compl., "Medenblik Decl.") [Doc. No. 10-

---

[12]    This provision appears to apply to all of the Nelsons' Policies as provided by American Family.  *See* (Decl. Pages, Ex. G, Attached to Medenblik Decl.) [Doc. No. 10-7 at 10]; (Gold Star Homeowners Amendatory Endorsement, "Endorsement," Ex. J., Attached to Medenblik Decl.) [Doc. No. 10-10 at 2].  The Court considers the Policies in making a determination on this Motion because they are "necessarily embraced by the pleadings."  *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 (8th Cir. 2012) (internal quotations and citations omitted).

This provision puts the onus on the Nelsons to make sure that they have "the appropriate amount of coverage."  It provides for a process whereby the Nelsons can lobby American Family to increase their coverage.  An increase in coverage favors American Family in the short term because it would likely be accompanied by a corresponding increased premium.  But the provision does not make any allowance for the Nelsons to *decrease* their coverage.  The fact that the Nelsons were able to successfully decrease their coverage one time during the relevant class period does not erase the fact that increasing—but not decreasing—coverage is specifically provided for in provision quoted above.  *See* (Compl. ¶¶ 31, 35).

1 at 28].[13]  Neither party disputes that the Nelsons' Policies entitle them to the replacement cost of their dwelling and its contents.  Instead, the contention is the *value* of that replacement cost and whether it is misrepresented in the Policies.

American Family's argument is essentially that because estimating a replacement cost is not an exact art, it cannot to be held to its own estimates.  *See* (Am. Family's Mem. at 10).  In this argument, American Family uses the replacement cost term as the amount of money that it would be required to pay to the Nelsons to replace the Nelsons' dwelling and its contents in the event of a total loss.  But there has been no total loss, and the Nelsons do not seek to hold American Family to the exact amount of the estimate in an effort to file a claim under their Policy.  Instead, the Nelsons argue that the estimate of the replacement cost is not just incorrect, but is overstated to such a high degree that their premiums increased.  (Compl. ¶ 39).  In other words, the Nelsons' allegations about the replacement cost is about the coverage that American Family told them they needed in order to insure themselves against a total loss.  *See* (Compl. ¶ 25); (Nelsons' MTD Opp'n at 15).  In particular, the Nelsons allege that the maximum replacement cost of their dwelling was $348,297 during the class period.  (*Id.* ¶ 33).  But the replacement cost that formed the basis of their premiums was as high as $454,500 in 2011, a difference of over $100,000.  (*Id.* ¶ 33).  That same year, American Family lowered its replacement cost estimate at the Nelsons request to $315,000, a difference of nearly $140,000.

---

[13]     Although the Court defers to Medenblik's descriptions of the exhibits, Exhibit A appears to contain several different documents.  The citation to page 28 refers to the 28th page of the document as posted on CM/ECF.

(*Id.* ¶ 35).  The Nelsons have therefore adequately pleaded that American Family misrepresented the amount replacement cost coverage that they needed. [14]

American Family alleges that it must pay the total amount of coverage promised and therefore it did not deceive the Nelsons into buying coverage that it would never pay.  (Am. Family's Mem. at 12); (Am. Family's Reply Mem. in Supp. of Mot. to Dismiss, "Am. Family's MTD Reply,") [Doc. No. 23 at 2–4].  American Family argues that Minnesota is a "valued policy" state, meaning that by statute, American Family is "required to pay the full amount of the coverage it promises in the event of a total loss, even if that coverage exceeds the actual replacement cost of the house."  (Am. Family's MTD Reply at 4); *see also* Minn. Stat. §§ 65A.01, subdiv. 5 (stating that Minnesota standard fire insurance policies cannot "limit[] the amount to be paid in case of a total loss . . . to less than the amount of insurance on the same."), 65A.08, subdiv. 2(a) ("the insurer shall pay the whole amount mentioned in the policy or renewal upon which it receives a premium, in case of total loss . . ."), 65A.13 (stating that an insurance policy that violates any provision of law is binding on the company that issued the policy); *Auto-Owners Inc. Co. v. Second Chance Invs., LLC*, 827 N.W.2d 766, 769–70 (Minn. 2013).  Whether and how much American Family would pay under the Nelsons' Policies in the event of a total

---

[14]    At oral argument, American Family argued that there was no misrepresentation about replacement cost because the term "replacement cost" was not used in connection with a dollar amount.  Instead, American Family said its Policy only discusses a limit for the dwelling.  *See* (Decl. Pages, Ex. C, Attached to Medenblik Decl.) [Doc. No. 10-3 at 3] (listing the limit for dwelling as $380,000).  American Family argues this dollar amount is limited by a condition given later in the Policy.  *See* (Endorsement at 2) (containing the "Estimated Replacement Cost" language quoted above).  In the Court's view, the distinction between these terms is not as clear as American Family suggests.  American Family argues that even if these two provisions can be read together to lead the Nelsons to believe that the limit on their dwelling is the same as the replacement cost, American Family has clearly stated that the number is simply an estimate and that the actual replacement cost may be different.  But, as stated above, the issue is the Nelsons' premiums based on overstated replacement cost, not on the actual replacement cost owed in the event of the Nelsons filing a claim under the Policy.

loss is a fact-specific inquiry that is not appropriate at this stage of the pleadings. Insurance policies are notoriously complex, and the statutes only require American Family to pay "the amount" stated in a policy; the statutes do not require American Family to pay "the replacement cost" stated in a policy. Therefore, whether the Minnesota legislature intended for those statutes to be read to require American Family to pay the replacement cost is not before the Court at this time.

While the Nelsons allege that they paid for coverage they may never actually receive, those allegations are not, as American Family claims, the "core" of their Complaint. As with the previous argument, American Family's argument relies on the replacement cost that would be at issue in the event of a total loss and at the point that American Family would owe the Nelsons money for a claim filed under the Policy. The Nelsons do not complain of the coverage actually *provided* when a total loss occurred. The Nelsons allege that, to be insured against a total loss and receive the replacement cost if they filed a claim under that section of the Policies, they paid too much in premiums. (Compl. ¶¶ 31, 39). The Nelsons seek redress for overpaid premiums, an injury that they allege they have suffered, and continue to suffer. They do no seek redress for American Family's actions in connection with a hypothetical total loss.

### b.  Particularity

The Nelsons' claims under the DTPA and CFA are pleaded with sufficient particularity to survive the Motion to Dismiss for failure to state a claim upon which relief can be granted. First, the Nelsons pleaded specific facts regarding the time, place, and contents of the misrepresentations. *Parnes*, 122 F.3d at 549. The Nelsons pleaded that they purchased their first American Family Policy in 1990, and beginning in 2004, their Policies contained the statements of misrepresentation described above. (Compl. ¶¶ 30, 31, 39). They renewed their Policy on a

regular basis, and they still have that Policy with American Family. (*Id.* ¶ 13). The contents of the misrepresentation have been described above, and are specifically pleaded in the Complaint. *See* (*id.* ¶¶ 1–5, 25, 26, 28, 30–39). Additionally, the Nelsons have identified that American Family is the party that made the misrepresentation, and that, as a result, they paid higher premiums than they otherwise would have if American Family had not made a misrepresentation. *See* (*id.* ¶¶ 28, 39).

### c.      Recommendation—Counts I and II

The Court finds that the Nelsons have pleaded claims under the DTPA and CFA with the particularity required by Rule 9(b). Therefore, the Court recommends that American Family's Motion to Dismiss be denied to the extent it seeks to dismiss Counts I and II.

### 2.      Count III—Unjust Enrichment and Negligence *Per Se*

As an alternative to the CFA claim, the Nelsons allege, on behalf of the Damages Class, that American Family's conduct has unjustly enriched it, and in the alternative, its actions constitute negligence per se. (Compl. ¶ 61–65).

### a.      Unjust Enrichment

For the unjust enrichment claim to survive, the Nelsons must show that American Family "'knowingly received something of value to which [it] was not entitled, and that the circumstances are such that it would be unjust for [American Family] to retain the benefit.'" *Hennepin Cnty v. Fed. Nat'l Mortg. Ass'n*, --- F. Supp. 2d ---, 2013 WL 1235589, at *6 (D. Minn. Mar. 27, 2013) (DSD/TNL) (quoting *Schumacher v. Schumacher*, 627 N.W.2d 725, 729 (Minn. Ct. App. 2001)). Equitable relief such as unjust enrichment "cannot be granted where the rights of the parties are governed by a valid contract." *M.M. Silta, Inc. v. Cleveland Cliffs, Inc.*, 616 F.3d 872, 880 (8th Cir. 2010) (internal quotations and citations omitted).

American Family argues a contract governs its relationship with the Nelsons, and therefore unjust enrichment is not an available remedy. (Am. Family's Mem. at 13–14). The Nelsons argue that because they have made claims based on misrepresentation, an equitable remedy available under the CFA is rescission. (Nelsons' MTD Opp'n at 20–21) (citing Minn. Stat. § 325F.69; *PCS Prof. Claim Svc., LLC v. Brambilla's, Inc.*, No. 06-cv-4540 (DWF/AJB), 2007 WL 3313661 (D. Minn. Nov. 6, 2007); *Ponzo v. Affordable Homes of Rochester, LLC*, No. A04-2234, 2005 WL 1804644 (Minn. Ct. App. Aug. 2, 2005)).

While rescission may be an available remedy under the CFA, the case the Nelsons cite in support of their proposition illustrates different circumstances. In *Ponzo*, a jury determined that the defendant company had breached the CFA in its sale of a manufactured home to the plaintiffs. *Ponzo*, 2005 WL 1804644, at *2. Following a bench trial to determine the proper remedy, the district court ordered rescission of the sales contract, a remedy the plaintiffs specifically sought. *Id.* at 1–2. But here, the Nelsons' Complaint does not seek rescission on behalf of the Damages Class. *See* (Compl. at 17 ¶¶ 3–4). The Damages Class's definition states that "[t]his class seeks monetary damages for prior excessive premium payments. Those class members (including the Nelsons) who continue to insure with American [Family] also seek injunctive and declaratory relief as members of [the Injunctive Class]." (Compl. ¶ 41). In their prayer for relief, the Nelsons seek "damages, costs, and attorney's fees . . . ." for the Damages Class. (*Id.* at 17 ¶ 3). In the alternative, the Damages Class seeks "equitable restitution of such amounts by which it was [unjustly] enriched." (*Id.* at 17 ¶ 4). At no point in the Nelsons' Complaint do they state that they want the Policies with American Family to be rescinded; instead they seek overpayments made in the execution of the contract. (Compl. ¶ 39).

Additionally, Minnesota statutes provide that American Family will be held to the language of their Policies, regardless of whether it violated a provision of law. Minn. Stat. §§ 65A.01, subdiv. 5 ("No provision shall be attached to or included in such policy limiting the amount to be paid in case of total loss on buildings by fire, lightning[,] or other hazard to less than the amount of insurance on the same."), 65A.08, subdiv. 2(a) ("In the absence of any change increasing the risk, without the consent of the insurer, of which the burden of proof shall be upon it, and in the absence of intentional fraud on the part of the insured, the insurer shall pay the whole amount mentioned in the policy or renewal upon which it receives a premium, in case of total loss, and in case of partial loss, the full amount thereof."), 65A.13 ("Notwithstanding any penalty prescribed for the making, issuing, or delivery of any policy in violation of any provision of law, every such policy shall be binding upon the company issuing the same."). This suggests that in the insurance context, rescission may not be an appropriate remedy. The Complaint establishes the Damages Class's request for money damages, not rescission. (Compl. ¶¶ 39, 41).

Based on the foregoing analysis, the Nelsons have failed to state a claim for unjust enrichment.

### b. Negligence Per Se

To establish a negligence per se claim, the Nelsons first must allege the elements of negligence: that American Family owed them a duty of care, that it breached that duty, that the Nelsons suffered an injury, and that the breach of the duty proximately case the injury. *See Elder v. Allstate Ins. Co.*, 341 F. Supp. 2d 1095, 1099 (D. Minn. 2004) (RHK/RLE). When a statute establishes the duty of care—instead of the traditional standard of the reasonable person of ordinary prudence—a court may find the actor liable for negligence per se. *Id.* (internal citations and quotations omitted). In other words, the breach of the statute "constitutes

conclusive evidence of negligence." *Id.* (citing *Osborne v. McMasters*, 40 Minn. 103, 41 N.W. 543, 544 (1889) (internal quotations omitted)). "It is well settled that breach of a statute gives rise to negligence per se if the persons harmed by that violation are within the intended protection of the statute and the harm suffered is of the type the legislation was intended to prevent." *Zorgdrager v. State Wide Sales, Inc.*, 489 N.W.2d 281, 284 (Minn. Ct. App. 1992). But negligence per se can only be grounded in a common law negligence claim; it does not create a new cause of action. *Elder*, 341 F. Supp. 2d at 1100.

The Nelsons argue that American Family beached the standard of care for insurance companies established by statute because it sold the Nelsons a property policy that exceeded the replacement cost. (Nelsons' MTD Opp'n at 23–24) (citing Minn. Stat. §§ 65A.01, subdiv. 3, 65A.09).[15] American Family argues that because there is no private right of action for those statutes, the Nelsons cannot use it to establish their negligence per se claim. (Am. Family's MTD Mem. at 14).

As an initial matter, the Nelsons must first allege the elements of common law negligence, including that American Family owed them a duty of care at common law. *Elder*, 341 F. Supp. 2d at 1099. The Complaint makes no such allegation.

But the negligence per se claim suffers from a more fatal flaw. The Minnesota Supreme Court found the Unfair Claims Practices Act ("UCPA") does not create a private cause of action

---

[15] Although the Complaint does not establish the statute under which the Nelsons' negligence per se claim rests (*see* (Compl. ¶¶ 61–65)), the Nelsons clarify in their opposition that "the illegality of the Nelsons' contract stems from Minn[esota] Stat[utute] [section] 65A.09[,] not Chapter 72A." (Nelsons' MTD Opp'n at 22).

for its violation.[16]  *Morris v. Am. Family Mut. Ins. Co.*, 386 N.W.2d 233, 238 (Minn. 1986).

Since that decision, courts in Minnesota, including in this District, have found that because the

UCPA does not provide a private right of action, a plaintiff cannot assert a common law claim

grounded in that same statute.  *See, e.g.*, *Elder*, 341 F. Supp. 2d at 1100–02 (finding plaintiff's

negligence per se claim failed as a matter of law because, *inter alia*, there was no underlying

duty for the defendant insurance company to inform plaintiff of a specific policy provision, and

because the UCPA did not provide a private right of action,); *Schermer v. State Farm Fire &

Cas. Ins. Co.*, 702 N.W.2d 898, 905 (Minn. Ct. App. 2005), *aff'd on other grounds,* 721 N.W.2d

307 (Minn. 2006) (stating that the plaintiff cannot "use an alleged violation of [the UCPA] to

prove elements of a common law claim); *Glass Serv. Co. v. State Farm Mut. Auto. Ins. Co.*, 530

N.W.2d 867, 872 (Minn. Ct. App. 1995) (holding the plaintiff cannot use a violation of the

UCPA to establish an element of its tortious interference with contract claim).  This line of cases

is consistent with other cases that have determined that a plaintiff's a common law claim

grounded in a non-insurance statute does not provide a private right of action.  *See, e.g.*, *Olson v.

Moorhead Country Club,* 568 N.W.2d 871, 873–74 (Minn. Ct. App. 1997) (holding employee

could not sue under common law claims for gratuities where her interest in gratuities was based

on the violation of a statute that did not provide a private right of action); *H.J. Inc. v. Nw. Bell

Corp.*, 420 N.W.2d 673, 676 (Minn. Ct. App. 1988) (affirming the district court's dismissal of

unjust enrichment claim challenging utility rates because Minnesota statute specifically provided

that there was no private right of action).  Further, the Eighth Circuit recently affirmed this

District's dismissal of class action complaints where plaintiffs alleged breach of contract based

---

[16]     The UCPA includes Minnesota Statute section 72A.20.  1984 Minn. Laws Ch. 555
(legislation passing the UCPA, which was codified as amended in Minnesota Statutes sections
72A.20, 72A.23, and 72A.25).

on an automobile insurance statute. *Palmer v. Ill. Farmers Ins. Co.*, 666 F.3d 1081, 1086 (8th Cir. 2012). In *Palmer*, the Eighth Circuit reviewed *Morris* and its progeny and determined that the plaintiffs' common law claim was "an attempt to circumvent Minnesota's administrative remedies and create a private right of action when the legislature has not." *Id.*

Minnesota state courts have not addressed directly whether section 65A.09 can be used to support a common law claim for negligence per se. But based on the case law developed in Minnesota state and federal courts, this Court assumes that the courts' refusal to allow a plaintiff to maintain a common law claim where a statute does not provide a private right of action applies with equal vigor to the Nelsons' negligence per se claim based on section 65A.09.[17] The Nelsons have failed to state a claim for negligence per se.

### c. Recommendation

Because the Court finds that the Nelsons have not stated a claim for unjust enrichment or negligence per se, it recommends that the Motion to Dismiss be granted to the extent it seeks dismissal of Count III.

## IV. CONCLUSION

Accordingly, based upon all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiffs' Motion to Remand [Doc. No. 15] be **DENIED**; and

---

[17] The Court finds that the line of cases in this section support the proposition that there is no private cause of action for common law claims grounded in statutory violations where the statute does not create a private right of action is consistent with *Force*, which permits claims to proceed under the DTPA and CFA. *See Force*, 4 F. Supp. 2d at 856. As described above, the Nelsons have alleged claims under the DTPA and CFA, and those statutes specifically provide for the Nelsons' claims. *See* Minn. Stat. §§ 325D.45 (stating that a person damaged by a deceptive trade practice under the DTPA may be granted an injunction), 8.31, subdiv. 3a (stating that a person damaged by violations of the CFA and other statutes listed in subdivision 1 may bring a civil action and recover damages).

2. American Family's Motion to Dismiss [Doc. No. 7] be **GRANTED in part** and **DENIED in part** as follows:

    a. To the extent the Motion seeks dismissal of Counts I and II, it is **DENIED**.

    b. To the extent the Motion seeks dismissal of Count III, it is **GRANTED**.

Dated: September 25, 2013

                             *s/Steven E. Rau*
                             STEVEN E. RAU
                             United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **October 9, 2013,** a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.