# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Charles P. Nelson and Darlene F. Nelson, on behalf of themselves and all other similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>American Family Mutual Insurance Company,<br><br>Defendant. | Case No. 13-cv-607 (SRN/SER)<br><br>**ORDER** |

Bert Black and Lawrence P. Schaefer, Schaefer Halleen LLC, 412 South 4th St., Ste. 1050, Minneapolis, MN 55415; Elizabeth R. Odette, Rebecca A. Peterson, and Robert K. Shelquist, Lockridge Grindal Nauen PLLP, 100 Washington Ave S., Ste. 2200, Minneapolis, MN 55401; Richard J. Fuller, Law Office of Richard J. Fuller, 40 Southeast 4th St., Ste. 506M, Minneapolis, MN 55415, counsel for Plaintiffs.

Aaron D. Van Oort, Deborah A. Ellingboe, Cicely R. Miltich, and Larry E. LaTarte, Faegre Baker Daniels LLP, 90 South 7th St., Ste. 2200, Minneapolis, MN 55402, counsel for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Plaintiffs' Objections to the Magistrate Judge's May 13, 2016 Order ("Pls.' Objs.") [Doc. No. 191]. Defendant American Family Mutual Insurance ("Defendant" or "American Family") filed a timely response to Plaintiffs' Objections. (American Family's Mem. in Opp. to Pls.' Objs. ("Def.'s Opp. to Objs.") [Doc. No. 194].) Plaintiffs' Objections are sustained in part. The Magistrate Judge's Order dated May 13, 2016 ("May 13 Order") [Doc. No. 190] is affirmed in part and

respectfully reversed in part for the reasons set forth below.

## I. BACKGROUND

The Court recounts only the facts and procedural history relevant to the present dispute. The Court refers to the facts and procedural history as presented in the previous order of this Court, the May 13 Order, and the parties' submissions where the parties do not dispute that presentation.

### A. Facts

Plaintiffs Charles and Darlene Nelson ("the Nelsons") have maintained a "Gold Star" insurance policy through Defendant on their home since 2004. (Am. Class Action Compl. ("Am. Compl.") at ¶ 11 [Doc. No. 42].) Defendant's Gold Star policies cover the replacement cost of a policyholder's home and its contents. (Id. at ¶¶ 1, 10.) Since 2010, Defendant has retained Millennium Information Services, Inc. ("Millennium" or "MIS") to conduct surveys of various homes insured by Defendant, including the Nelsons' property. (See Order dated December 30, 2015 ("Dec. 30 Order") at 2 [Doc. No. 149].) The purpose of these surveys was to establish the estimated replacement cost of the homes. (See id.) Millennium operates a database, the Millennium Automated Property System ("MAPS"), which collects and analyzes data related to replacement cost estimates. (Id. at 2–3.) Defendant can access and enter some specific data in MAPS, such as information related to individual home surveys, but is not capable of extracting large quantities of data without incurring significant burdens. (Id. at 3.)

Defendant itself operates a "mainframe database." (See Def.'s Ltr. dated April 1, 2016 ("Def.'s April 1 Ltr.") at 7 [Doc. No. 182].) That database includes a "notes" field

where Defendant "documents underwriting discussions and decisions with respect to changes in replacement cost estimates. The notes field captures underwriter activities regardless of the medium of communication: in person, review of a report, email correspondence, phone conversation, or otherwise." (Id. at 8.)

### B. Procedural Background

#### 1. Plaintiffs' Claims

Initially, the Nelsons alleged, as part of a proposed class action, that Defendant overcharged Gold Star policyholders on their premiums because it used exaggerated replacement cost assessments to justify excessive insurance coverage on properties. (See Am. Compl. at ¶¶ 1–4 [Doc. No. 42].) As discovery progressed, the Nelsons' theory of the case evolved somewhat. They now maintain that Defendant failed to adjust its insurance coverage amount for some policies even after learning that the properties' replacement costs were lower, resulting in policyholders paying inflated premiums for the excessive coverage. (See May 13 Order at 6; Pls.' Objs. at 11; Hr'g Tr. dated March 25, 2015 ("March 25 Hr'g Tr.") at 28–29, 41–42 [Doc. No. 184].)

#### 2. Discovery Requests and Initial Responses

As part of their discovery, Plaintiffs served numerous requests for production ("RFPs") on Defendant in August of 2014. (See May 13 Order at 9.) In relevant part, these requests included:

> **REQUEST NO. 5:** All records, reports, memoranda, directives or other documents concerning inaccuracies or errors made in establishing or estimating the replacement value (either current, past, or future) of real or personal property insured by American Family, including but not limited to the property of named Plaintiffs, the prevalence of any such errors, the

causes of such errors, and instructions for correcting any such errors.

…

**REQUEST NO. 13:** Through counsel American Family has represented that a company called Millennium Information Services ("MIS") conducted some type of review of replacement cost estimates for the homes of some of American Family's insureds. Please produce all documents constituting or relating to this review, including without limitation all communications between MIS and American Family or the agents, consultants, or other representatives of American Family.

**REQUEST NO. 14:** All documents relating to downward adjustments in the replacement value or cost for homeowners' property insured under Gold Star policies, including the downward adjustment in the replacement value or cost of named Plaintiffs' property.

**REQUEST NO. 15:** All documents of any nature related to surveys of homeowners policies conducted on behalf of American Family by Millennium Information Services ("Millennium") including but not limited to:
. . .
f.  Lists of policies surveyed and the results of individual policy reviews.

(Id.)

Initially, Defendant made a limited production of documents subject to a series of boilerplate objections about the breadth of these requests and the burden of responding. (See Def.'s Mem. in Opp. to Pls.' Second Mot. to Compel ("Def.'s Mem. in Opp. to Second MTC") at 4–6 (describing Defendant's objections and initial production) [Doc. No. 171]; May 13 Order at 14–16 (same).)  Important to the present matter, this initial production contained only the mainframe database notes on the Nelsons' property and lacked any explanation of the source of these notes.[1]  (See Def.'s Apr. 1 Ltr. at 7–8;

---

[1] As discussed below, the parties dispute when Defendant meaningfully disclosed the existence of the mainframe database and its contents.

Def.'s Opp. to Objs. at 6.)

### 3. The First Motion to Compel

Plaintiffs were not particularly diligent in pursuing discovery: they sought and received an extension of the discovery deadline, substituted counsel, but even then did not raise the challenges which generated the current dispute until just two weeks before the close of discovery—nearly nine months after Defendant provided its initial response to their discovery requests. (See May 13 Order at 5–6, 14, 16.) Still, before discovery closed, Plaintiffs challenged Defendant's objections to their discovery requests and brought a motion to compel Defendant to supplement its previous disclosures (the "First MTC"). (See id. at 6–7.)

The First MTC focused on the production, or lack thereof, of documents related to Millennium, MAPS, and communications between Defendant and Millennium. (See id.) Evident from the briefing and supporting documents filed with the First MTC was the fact that Defendant—pursuant to its discovery objections—withheld a large number of documents that were relevant to Plaintiffs' claims and responsive to their discovery requests. (Dec. 30 Order at 6.) This Court found that Defendant's failure to disclose responsive documents raised concerns about what else Defendant had withheld. (Id.) To address these concerns, Defendant was ordered to provide an affidavit containing information about the limitations it employed responding to Plaintiffs' discovery requests so that Judge Rau might assess the validity of Defendant's productions to-date. (Id. at 7–8.)

Defendant duly submitted an affidavit describing the process it employed to

search, limit, and disclose documents in response to Plaintiffs' discovery requests. (See Sworn Aff. of Daniel R. Olson dated January 15, 2016 ("Jan. Olson Aff.") [Doc. No. 154].) However, this affidavit made no mention of the mainframe database, focusing instead on Millennium and MAPS. (See id.) Defendant averred that "it ha[d] produced all non-privileged, responsive documents that it identified and collected through the means described herein and subject to the objections American Family made in its discovery responses." (Id. at ¶ 30.)

Following the submission of Defendant's affidavit, the parties met and conferred regarding Defendant's discovery productions to that point. Plaintiffs asked whether Defendant had "provided or identified all documents relating to its underwriting department reviews [of the Millennium and MAPS replacement cost surveys] and how such reviews are maintained/retrieved." (See Decl. of Deborah A. Ellingboe in Opp. to Pls.' Objs. ("Ellingboe Decl.") at ¶ 5 [Doc. No. 195], Ex. E ("Def.'s January 28 Ltr.") at 8 [Doc. No. 195-5].) In relevant part, Defendant responded that "American Family underwriters perform reviews of individual policies by viewing survey and policy information electronically. Changes in the replacement cost estimate are documented in MAPS . . . and a policy-specific notes field in the American Family mainframe computer system." (Id.). However, Defendant stated that it had not produced the mainframe database notes "because [that] would require an unduly burdensome policy-by-policy review." (Id.)

### 4. The Second Motion to Compel

Plaintiffs continued to believe that Defendant's discovery responses, especially

related to the MAPS data, were incomplete and filed their Second Motion to Compel (the "Second MTC"). (See Second Mot. to Compel [Doc. No. 159]; Pls.' Mem. in Supp. of the Second MTC at 1–4 [Doc. No. 161].) Important to the present dispute, Plaintiffs argued that the documents which were produced suggested that other documents regarding Defendant's "refinement or rejection" of Millennium's replacement cost estimates were not. (See Pls.' Mem. in Supp. of the Second MTC at 14–17.) Plaintiffs hypothesized that these unproduced documents were "either contained within the MAPS relational database or *within [Defendant's] internal electronically stored information systems.*" (Id. at 8 (emphasis added).) However, the mainframe database was never explicitly mentioned in the Second MTC or any of the parties' associated briefing.[2] (See Second Mot. to Compel; Pls.' Mem. in Supp. of Second MTC; Def.'s Mem. in Opp. to Second MTC; Pls.' Reply in Supp. of the Second MTC [Doc. No. 175].) To obtain the information they believed was missing, Plaintiffs sought access to all documents and information related to MAPS, all email correspondence between Defendant and Millennium, and an order that Defendant provide additional information about the extent of its discovery responses or supplementation to those responses. (See Pls.' Mem. in Supp. of Second MTC at 3–4.)

### 5. The Parties' Sampling Proposals

The night before the hearing on the Second MTC, Plaintiffs sent Defendant a

---

[2] At the hearing on the Second MTC, the mainframe database was briefly discussed in relation to the costs Defendant might incur if the Second MTC was granted. (March 25 Hr'g Tr. at 18–19.) However, Plaintiffs explained that this was the first time that they heard about the mainframe database and its contents. (See id. at 32.)

7

proposal that would limit, at least initially, their discovery requests to the production of emails and documents specific to nine of Defendant's employees and 800 insurance policies ("Plaintiffs' First Sampling Proposal"). (See Ex. 1 to Pls.' Ltr. dated March 25, 2016 [Doc. No. 179-1].) Plaintiffs' First Sampling Proposal was discussed at the hearing on the Second MTC and Judge Rau ordered that Defendant file a response to that proposal. (See March 25 Hr'g Tr. at 21–23, 61–66.)

In its response, Defendant argued in part that there was a "much better alternative" to Plaintiff's First Sampling Proposal. (See Def.'s April 1 Ltr. at 7.) Defendant described the mainframe database as "the only institutionally-maintained relevant data source Plaintiffs do not possess." (Id.) It went on to explain that the mainframe database contained "underwriting discussion and decisions with respect to changes in replacement cost estimates. The notes field captures underwriter activities regardless of the medium of communication: in person, review of a report, email correspondence, phone conversation or otherwise." (Id. at 8.) That letter also included the mainframe database notes from five Gold Star policies. (See Ex. A to Def.'s April 1 Ltr ("Sample Notes") [Doc. No. 182-1].) According to Defendant, "Plaintiffs are unlikely to find the information they seek [in the Second MTC] via policy-specific email searches. However, all the information they claim to seek *is* captured in mainframe notes." (Def.'s April 1 Ltr. at 8 (emphasis original).) Thus, Defendant suggested that it produce the mainframe database notes for 200 policies that were part of Millennium's replacement cost surveys ("Defendant's Sampling Proposal"). (See id. at 9.)

Plaintiffs objected to Defendant's late disclosure of the mainframe database and its

significance as a source of relevant information to their claims and the parties' discovery disputes.  (See Pls.' Ltr. dated April 8, 2016 ("Pls.' April 8 Ltr.") at 1, 9 [Doc. No. 185].) Plaintiffs asked that Judge Rau grant their First Sampling Proposal, as well as require Defendant to "produce [from the mainframe database] . . . all notes relating to the policies listed in the Millennium spreadsheets and the information contained in other fields that contain information about replacement cost estimates and/or coverage actually taken[,]" ("Plaintiffs' Second Sampling Proposal").  (Id. at 9.)  Defendant responded by arguing that it previously disclosed the mainframe database and that Plaintiffs' Second Sampling Proposal was unduly burdensome, expensive, and not proportionate to the needs of the case.  (See Def.'s Ltr. dated April 13, 2016 [Doc. No. 186].)  Plaintiffs objected to these contentions, arguing that their Second Sampling Proposal was reasonable and appropriate under the circumstances.  (See Pls.' Ltr. dated April 19, 2016 [Doc. No. 189].)

### 6. Judge Rau's Order on the Second MTC

Judge Rau issued an order denying the Second MTC.  (May 13 Order at 30.)  In relevant part, Judge Rau found Plaintiffs' requested relief to be untimely and unduly burdensome in relation to the potential benefit of such discovery.  (See id. at 20–29.) Important to the present matter, the May 13 Order addressed only Plaintiffs' requests in the Second MTC (which focused on MAPS and Millennium) and made no mention of the mainframe database.  (See id.)  Judge Rau acknowledged the parties' competing sampling proposals, but rejected them because "these [proposals] are complicated and will assuredly lead to yet more discovery about discovery—something [sic] Court will not further sanction in this case . . . ."  (See id. at 28.)

## II. DISCUSSION

The discovery disputes between the parties initially focused on the production of documents related to Millennium and MAPS. However, especially after the Second MTC was briefed and argued, at the last moment, the focus shifted almost entirely to the mainframe database. Both parties bear responsibility for why this significant source of information relevant to Plaintiffs' claims was not raised until the eleventh hour of discovery.

As a result of this last minute shift in focus, Judge Rau did not address the mainframe database in the May 13 Order. This Court finds that a limited production of documents from the mainframe database is appropriate and will occur as set forth in this Order.

### A. Legal Standard for Review of Non-Dispositive Orders

A magistrate judge's order on a non-dispositive issue is overturned on review where it is shown that the order is clearly erroneous or contrary to law. Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A); D. Minn. L.R. 72.2(a). Only where the reviewing district court has a "definite and firm conviction" that the magistrate judge erred is a reversal warranted. See Saleen v. Waste Mgmt., Inc., 649 F. Supp. 2d 937, 943 (D. Minn. 2009).

### B. Plaintiffs' Objections to the May 13 Order

Plaintiffs' specific objections relate to Judge Rau's denial of their Second Sampling Proposal and fall into three categories. First, Plaintiffs explain that their

requested discovery related to the mainframe database is timely. (See Pls.' Objs. at 5–7.) Second, Plaintiffs argue that discovery related to the mainframe database is not unduly burdensome for Defendant to produce, especially considering its importance to Plaintiffs' claims. (See id. at 8–10.) Third, Plaintiffs allege that the May 13 Order misstated the record and relied on incorrect assumptions to deny Plaintiffs' requested relief for email sampling and discovery concerning the mainframe database. (See id. at 10–14.)

### 1. Timeliness

Plaintiffs argue that their demand for all of Defendants' mainframe database notes on relevant insurance policies was timely considering the mainframe database was not meaningfully disclosed by Defendant until after the hearing on the Second MTC. (See Pls.' Objs. at 5–6.) Plaintiffs further contend that these notes are responsive to one or more of their RFPs and at a minimum should have been disclosed in Defendant's affidavit following the December 30 Order. (See id. at 7.) Defendant argues that it identified the mainframe database as a source of relevant information on multiple occasions before April of 2016 and thus Plaintiffs discovery request is untimely. (Def.'s Opp. to Objs. at 6–7.)

The Rules provide for the denial of otherwise allowable discovery if a court determines that "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action[.]" Fed. R. Civ. P. 26(b)(2)(C)(ii). However, "[t]he overriding purpose of the federal discovery rules is to promote full disclosure of all facts to aid in the fair, prompt and inexpensive disposition of lawsuits." Bredemus v. Int'l Paper Co., 252 F.R.D. 529, 533 (D. Minn. 2008) (quotations omitted); see Liguria Foods,

Inc. v. Griffith Labs., Inc., 309 F.R.D. 476, 479 (N.D. Iowa 2015) ("The rules of procedure concerning discovery in a civil action are to be broadly and liberally construed in order to fulfill discovery's purposes of providing both parties with information essential to the proper litigation of all relevant facts, to eliminate surprise, and to promote settlement." (quotations omitted)); Fed. R. Civ. P. 1 ("[The Rules] should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."). To this end, parties must diligently pursue discovery and be forth-coming in their discovery responses. See Liguria Foods, 309 F.R.D. at 479 ("Parties to civil litigation have a duty to provide true, explicit, responsive, complete and candid answers to discovery."); Shukh v. Seagate Tech., LLC, No. 10-cv-404 (JRT/JJK), 2013 WL 53835, at *5 (D. Minn. Jan. 3, 2013) parties have a duty to diligently pursue discovery within the timelines set by the court).

Although Defendant acknowledged the existence of the mainframe database and produced the notes on the Nelsons' property early in the discovery process, these prior disclosures were extremely limited. (See Ellingboe Decl. at ¶¶ 3–4, Ex. C at 3 [Doc. No. 195-3] (containing the mainframe database notes on the Nelsons' property, but lacking any indication of the notes' source), Ex. D at 2 [Doc. No. 195-4] (Rule 30(b)(6) deposition transcript where Defendant described the mainframe database as where "customer information, policy information, [and] everything that's needed in order to insure a policy" was stored). At best, the mainframe database was substantively disclosed in early 2016. (See Def.'s January 28 Ltr. at 8 (describing how Defendant's "[c]hanges in the replacement cost estimate" for an insured property were recorded in

MAPS and the mainframe database, which Defendant had not produced).)  However, it was not until April of 2016 that Defendant first "connected the dots" between the information contained in the mainframe database, the previously produced MAPS data, and the parties' discovery dispute about whether the MAPS data was complete.  (See Def.'s April 1 Ltr. at 7–8.)

Defendant fails to explain why it did not meaningfully disclose the mainframe database earlier in the discovery process despite the information contained therein being plainly relevant to Plaintiffs' claims and responsive to one or more of Plaintiffs' RFPs.  Assuming Defendant withheld this information from its discovery productions pursuant to its boilerplate objections[3], it was required to disclose that fact by this Court's December 30 Order.  Yet, for whatever reason, Defendant's affidavit explaining the limitations on its discovery responses made no mention of the mainframe database.  Plaintiffs' request for the mainframe database notes, which immediately followed Defendant's April 1 Letter, cannot fairly be categorized as untimely.

The May 13 Order makes no mention of the mainframe database, let alone the circumstances of its disclosure.  To the extent Judge Rau denied Plaintiffs' discovery requests related to the mainframe database on the basis that they were untimely, this Court respectfully finds that denial to be in error.

---

[3] Generic objections to discovery requests are generally deemed to be inappropriate.  See Lubrication Techs., Inc. v. Lee's Oil Serv., LLC, No. 11-cv-2226 (DSD/LIB), 2012 WL 1633259, at *5 n.5 (D. Minn. Apr. 10, 2012) ("Boilerplate objections, without more specific explanations for any refusal to provide information, are not consistent with the Federal Rules of Civil Procedure.").

### 2. Proportionality and Burden

Plaintiffs object to the conclusion that their discovery requests for email sampling and the mainframe database notes are unduly burdensome and not proportional to the case. (See Pls.' Objs. at 8–10.) Specifically, Plaintiffs argue that Defendant failed to adequately explain why emailing sampling and production of the mainframe database notes are unduly burdensome. (Id. at 8.) Plaintiffs further contend that their requested discovery is proportionate to the case, especially in light of its importance to class certification. (See id. at 10.)

Defendants respond by offering estimates that it would cost $7.7 million (at $32,300 per email custodian) to produce the emails Plaintiffs requested in the Second MTC and $1.3 million to produce the mainframe database notes on all relevant policies. (Def.'s Opp. to Objs. at 9.) Defendant, without any technical explanation, avers that it can only extract notes from the mainframe database on a policy-by-policy basis and that its ability to search emails is also limited. (See id. at 10.) Defendant further argues that despite the claw-back provision in the protective order, it would have to review all documents before producing them to preserve privilege, further increasing its burden. (See id. at 11–12.) Finally, Defendant contends that Plaintiffs have failed to explain why the documents they seek are relevant to their claims and not disproportionate to the needs of the case. (See id. at 13–14.)

> In litigation, a party:
>
> may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount

> in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). A party may refuse to provide electronically stored information (like that in the mainframe database) responsive to a discovery request based on the cost or burden of production. See Fed. R. Civ. P. 26(b)(2)(B). However, a party which withholds discoverable electronic information bears the burden of showing its basis for doing so. Id. Even if such a showing is made, "the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery." Id. A court must limit discovery where it is unreasonably cumulative, can be obtained from another source that is more convenient or less burdensome, the party seeking the discovery does so in an untimely fashion, or the discovery is outside the scope of Rule 26(b)(1). Fed. R. Civ. P. 26(b)(2)(C)(i)–(iii).

The mainframe database notes are undoubtedly relevant to Plaintiffs' claims—a fact Defendant recognizes. (See Def.'s April 1 Ltr. at 7–8 (describing the mainframe database as a "relevant data source" containing precisely the sort of information— underwriting decisions related to property replacement cost estimates—that Plaintiffs' claims are based on). Nor does Defendant suggest that the mainframe database notes are duplicative of other documents previously produced. (See id. at 8 (describing how Plaintiffs are unlikely to find information regarding Defendant's refinement or rejection of Millennium's replacement cost surveys through email searches because that

information is contained in the mainframe notes).

The fact that Defendant may incur even substantial costs in producing the notes because the mainframe database is not easily searchable does not warrant the entire denial of Plaintiffs' discovery request. See Webb v. Ethicon Endo-Surgery, Inc., No. 13-cv-1947 (JRT/JJK), 2015 WL 317215, at *7 (D. Minn. Jan. 26, 2015) ("The fact that a corporation has an unwieldy record keeping system which requires it to incur heavy expenditures of time and effort to produce requested documents is an insufficient reason to prevent disclosure of otherwise discoverable information." (quotations and citations omitted)). Instead, the issue is how to strike the proper balance between the burden to Defendant in producing the mainframe database notes and the fact those documents are highly relevant and discoverable (i.e., the scope of the production).[4]

Currently, the record does not allow for an informed decision about the appropriate scope of production for the mainframe database notes. Although Judge Rau considered burden and proportionality, he did so with no mention of the mainframe database or a discussion of the parties' various sampling proposals, which he concluded were untimely. (See May 13 Order at 26–29.)

## III. CONCLUSION

Discovery is designed to facilitate the fair and reasonable resolution of a case.

---

[4] Considering Defendant's representation that the mainframe database captures all "underwriting discussion and decisions with respect to changes in replacement cost estimates" regardless of the "medium of communication," a production of these notes obviates the need for the production of Defendant's emails on this same subject. (See Def.'s April 1 Ltr. at 8.) The Court thus affirms the May 13 Order to the extent it denied Plaintiffs' email sampling request.

The parties have lost sight of this end, repeatedly failing to resolve disputes that were avoidable had they simply abided by their obligations to be diligent in their discovery efforts and forth-coming in their discovery responses. Plaintiffs and Defendant share the blame for this state of affairs. However, dwelling on these past transgressions will not fairly resolve the parties' present dispute. The parties must focus their efforts on creating a reasonable and expeditious plan for proceeding with discovery.

The Court anticipates that after the production described below, fact discovery will conclude in this matter. With the conclusion of discovery will come summary judgment, class certification, and/or trial, all of which will be overseen by this Court. For the sake of efficiency, this Court will also oversee this final step of fact discovery.

## IV. ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Objections [Doc. No. 191] are **SUSTAINED IN PART**.

2. Magistrate Judge Rau's Order dated May 13, 2016 [Doc. No. 190] is **AFFIRMED IN PART AND RESPECTFULLY REVERSED IN PART** as follows:

    a. The mainframe database notes regarding property replacement cost assessments are relevant to Plaintiffs' claims and responsive to Plaintiffs' discovery requests. Thus, Defendant is **ordered** to produce relevant mainframe database notes according to the following procedure:

        i. The parties are **ordered** to immediately meet and confer on the following topics: (1) the appropriate scope of the production and whether sampling would assist in reasonably limiting the scope of production, (2) the burden Defendant will incur in producing its mainframe database notes and how that burden might be

  minimized, (3) how to avoid or resolve any privilege-related issues arising from the production, and (4) a timeline for this production and an end to fact discovery. As part of this meet and confer, both Plaintiffs and Defendant are **ordered** to have information technology personnel present so that they might properly address any technological limits or considerations affecting the production;

 ii. By August 1, 2016, the parties are **ordered** to submit, to this Court, either: (1) a joint proposal on how to proceed with this production, or (2) briefing summarizing their differences on how to proceed. Any briefing regarding the parties' differences on how to proceed **will include**: (1) each party's proposal for the production of Defendant's mainframe database notes, (2) a description of a party's reliance on any expert opinion regarding the statistical significance of any sampling proposal, and (3) the relevant insurance policies and/or timeframe to use in limiting the production. Defendant is also **ordered** to submit, with its briefing, a sworn affidavit describing its technical limitations in searching and reviewing the mainframe database. Each party's briefing shall be no more than ten pages. The Court will resolve any dispute between the parties on the papers; there will be no hearing.

b. Plaintiffs did not specifically object to Magistrate Judge Rau's ruling regarding discovery related to Millennium and MAPS, thus those ruling are **affirmed**. The Court also **affirms** the denial of Plaintiffs' request to sample Defendant's emails.

Dated: July 18, 2016       s/ Susan Richard Nelson
                 SUSAN RICHARD NELSON
                 United States District Judge