# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Charles P. Nelson and Darlene F. Nelson, on behalf of themselves and all other similarly situated,<br><br>              Plaintiffs,<br><br>v.<br><br>American Family Mutual Insurance Company,<br><br>              Defendant. | Case No. 13-cv-607 (SRN/SER)<br><br><br><br>**ORDER** |

Bert Black and Lawrence P. Schaefer, Schaefer Halleen LLC, 412 South 4th St., Ste. 1050, Minneapolis, MN 55415; Elizabeth R. Odette, Rebecca A. Peterson, and Robert K. Shelquist, Lockridge Grindal Nauen PLLP, 100 Washington Ave S., Ste. 2200, Minneapolis, MN 55401; Richard J. Fuller, Law Office of Richard J. Fuller, 40 Southeast 4th St., Ste. 506M, Minneapolis, MN 55415, counsel for Plaintiffs.

Aaron D. Van Oort, Deborah A. Ellingboe, Cicely R. Miltich, and Larry E. LaTarte, Faegre Baker Daniels LLP, 90 South 7th St., Ste. 2200, Minneapolis, MN 55402, counsel for Defendant.

SUSAN RICHARD NELSON, United States District Judge

        This matter is before the Court on Defendant's Motion for Summary Judgment on Plaintiffs' Individual Claims ("Def.'s Mot. for Summ. J.") [Doc. No. 221], Plaintiffs' Motion to Certify the Class ("Pls.' Class Cert. Mot.") [Doc. No. 208], and various *Daubert* challenges to expert witnesses made by both parties (collectively, the "*Daubert* Mots.") [Doc. Nos. 203, 214, 227, 232]. For the reasons set forth below, Defendant's Motion for Summary Judgment is granted, Plaintiffs' Class Certification Motion is

denied as moot, and the *Daubert* Motions are denied as moot.

## I.   BACKGROUND

### A. Facts

Plaintiffs Charles and Darlene Nelson (the "Nelsons") allege that they paid excessive insurance premiums on their home in Monticello, Minnesota (the "Nelson Home") because Defendant American Family Mutual Insurance ("American Family") failed to accurately estimate the proper replacement cost of their home from 2007 through 2010.  On behalf of a putative class, they allege breach of contract, negligent misrepresentation, and violations of Minnesota's deceptive trade practices and consumer fraud statutes.

#### 1.  Estimated Replacement Costs and Insurance Coverage

To assist homeowners in determining the appropriate amount of property insurance coverage required for their homes, insurers attempt to estimate the replacement cost of the property in question.  (*See* Decl. of Elizabeth R. Odette in Supp. of Pls.' Mot. for Class Cert. ("First Odette Decl.") [Doc. No. 215], Ex. 5 ("Olson Dep.") at 27–28[1] [Doc. No. 215-2].)  The replacement cost of a property is the cost to construct a home with similar utility and function using modern materials and building standards.  (Decl. of Deborah A. Ellingboe in Supp. of American Family's Mot. for Summ. J. ("First Ellingboe Decl.") [Doc. No. 225], Ex. 6 ("Strachota Dep.") at 133, 177; *see* First Ellingboe Decl., Ex. 7 ("Stockness Dep.") at 102, 107–08 [Doc. No. 225-7].)  This is a

---

[1] For all depositions, the Court cites to the page numbers as they appear in the deposition itself.

measurement that is distinct from the reproduction cost or market value of the same property. (*See* Strachota Dep. at 133–34, 144–47, 177–78; Stockness Dep. at 104, 109.) However, estimating replacement costs "is not an exact science" for at least two reasons: (1) it is an attempt to anticipate a future event (i.e., what it would actually cost to rebuild a similar property in the event of a loss) that involves numerous unknown and regularly changing variables, (*see* Olson Dep. at 126–28; Stockness Dep. at 234–35; First Odette Decl., Ex. 7 ("Tutt Dep.") at 99–101 [Doc. No. 215-2]); and (2) it involves assessments that are inherently subjective and vary depending on the assessor.

### 2. Auto Valuation Programs and the Quality Grade Input

To generate replacement cost estimates, insurers and appraisers use auto-valuation software or other written guides or indexes. Some examples are 360Value (produced by Xactware), Marshall Swift Valuation Service ("Marshall"), and Robert Morris. (Strachota Dep. at 47–48.) American Family has at all relevant times used 360Value. (Olson Dep. at 126.) The Nelsons' experts[2] employ the Marshall program. (Strachota Dep. at 46–48, 79–80; Stockness Dep. at 19–20.) However, the Nelsons' experts express no criticism of 360Value or American Family's use of that valuation software. (Strachota Dep. at 48–52, 167–68; Stockness Dep. at 29–31, 111.) In fact, they were unfamiliar with 360Value until their involvement in this litigation, but they generally agree that an insurer's responsible use of this software is reasonable. (*See* Strachota Dep. at 48–50,

---

[2] Plaintiffs' experts are Robert Strachota and Christopher Stockness, both of whom work for Shenehon Business and Real Estate Valuations. American Family brought *Daubert* challenges against these experts. However, since it does not alter the result, the Court assumes, without ruling, that these experts' opinions are admissible and relies on them accordingly. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014).

247–48, 289; Stockness Dep. at 30–31, 219–20.)

To produce an estimated replacement cost, an insurer/appraiser gathers information about the property[3]—by talking to the property owner, inspecting the property, and/or researching public databases (e.g., tax records, Google images, building permits, etc.)—and enters it into the valuation software. (Decl. of Daniel R. Olson in Opp. to Pls.' Mot. for Class Cert. ("Olson Decl.") at ¶ 4 [Doc. No. 251-6]; Olson Dep. at 30, 38; *see* Strachota Dep. at 135–36, 154 (describing a similar system for the Marshall program); Stockness Dep. at 222–23 (same).) The software, with these property-specific inputs as well as stored data (e.g., building cost indexes based on geographic location, labor rates, environmental factors, etc.), then generates an estimated replacement cost. (Olson Dep. at 38, 53; First Ellingboe Decl., Ex. 26 ("360Value Product Overview") at Am. Fam. 1626–37[4] [Doc. No. 226-5]; *see* Strachota Dep. at 175–76, 228–29, 235 (describing a similar system for the Marshall program).)

Although the various valuation programs share many similarities, there are differences between them. Accordingly, they can generate different replacement cost estimates for the same property. For example, 360Value and Marshall can generate different replacement cost estimates for the same property despite using approximately the same property-specific information. (*See* Stockness Dep. at 151–53, 186; Strachota

---

[3] Examples of the information collected include finished square footage, age of the structure, number of stories, size of the rooms, characteristics of the basement and foundation, fireplaces, style of house, and type of exterior covering. (*See* First Ellingboe Decl., Ex. 8 [Doc. No. 225-8] and Ex. 24 [Doc. No. 226-4].)

[4] The Court cites to the last four digits of the Bates stamp located in the lower right hand corner of the document when referencing the 360Value Product Overview.

Dep. at 211, 221; First Ellingboe Decl., Ex. 5 ("Dismeier Dep.") at 221 [Doc. No. 225-5].) The precise reason for, and the extent of, these differences is unclear. (*See* Stockness Dep. at 151–53, 221.) However, there is no evidence in the record suggesting that 360Value's estimated replacement costs are unreliable or inaccurate due to some inherent defect or inaccuracy in the way that program processes the information it receives, or in its stored data. Rather, 360Value appears to be widely used and trusted within the insurance and appraisal industries. (*See* Strachota Dep. at 48–51, 167–68; Dismeier Dep. at 212–13.) Again, the Nelsons' experts do not dispute that 360Value is an acceptable way to generate replacement cost estimates. (*See* Strachota Dep. at 48–52, 167–68, 247–48, 289; Stockness Dep. at 29–31, 111, 219–20.)

Not surprisingly, the more information about a property entered into the valuation program, the more refined and precise the estimated replacement cost. (Olson Dep. at 121, 136–37.) However, some inputs are particularly consequential because they dictate assumptions the program makes about a property. Relevant here is the "quality grade" (sometimes referred to as the "quality of construction" or "condition") assigned to a property. (*See* Stockness Dep. at 197 (describing the quality grade as a "key characteristic" in estimating replacement costs).) The quality grade is meant to capture the general type and condition of various fixtures and finishes in a particular property, as compared to other homes of a similar age in that geographic area. (*See* 360Value Product Overview at Am. Fam. 1628; Strachota Dep. at 127–28, 171–73; Pls.' Mem in Opp. to

Summ. J. ("Pls.' Mem. in Opp.") at 10[5] [Doc. No. 240].)  For instance, 360Value uses the quality grade to set default assumptions—that may be manually altered—about the type and cost of certain construction materials (e.g., kitchen counter tops, bathroom tub/shower and vanity, flooring, exterior siding, interior paint, etc.).  (360Value Product Overview at Am. Fam. 1628; First Ellingboe Decl., Ex. 8 ("2006 360Value Report") [Doc. No. 225-8] and Ex. 24 ("2010 Millennium 360Value Report") [Doc. No. 226-4]; Dismeier Dep. at 232; *see* Strachota Dep. at 171–73, 186–88, 199 (describing a similar system for the Marshall program); Stockness Dep. at 129, 202–04 (same).)  The higher the quality grade, the higher the estimated replacement cost.  (*See* Strachota Dep. at 199– 200; Stockness Dep. at 90, 235–36; Pls.' Mem. in Opp. at 10.)

"360Value sets the initial Quality Grade based on Zip/Postal Code, Year Built, and Total Finished Square Feet.  The Quality Grade is then adjusted as more information is gathered about the structure."[6]  (360Value Product Overview at Am. Fam. 1628.)  The Nelsons' experts do not provide a precise explanation as to how a quality grade is assigned using the Marshall system.  (*See* Strachota Dep. at 127–32, 155–63 (generally describing how the expert arrived at the quality grade for the Nelson Home in 2015).)  However, they agree that determining the quality grade for a property involves the subjective judgment of the appraiser/insurer.  (Strachota Dep. at 127–30, 154–55, 164,

_____

[5] The Court cites to the page numbers as they appear in Plaintiffs' Memorandum in Opposition.

[6] Although 360Value assigns a default quality grade as just described, that input can apparently be manually set or altered by the individual conducting the assessment.  (Pls.' Mem. in Opp. at 7–8, 10; *see* Stockness Dep. at 119 (describing a similar feature in the Marshall program).)

247–48, 264–65; Stockness Dep. at 68, 87–89, 91, 119, 236–37.) As one of the Nelsons' experts explained: "The [condition or quality grade] is our interpretation of the physical presence of that property. It doesn't relate, really, to Marshall Valuation. Marshall Valuation doesn't make a judgment as to the physical condition of the property." (Strachota Dep. at 129; *see id.* at 155 ("I'm looking at the features about the property that cause me to make a judgment of whether we are an average home or we're a little better than average and [sic] we're good and so on.").) Appraisers, insurers, and property owners may legitimately disagree about what the "correct" quality grade is for a particular property, especially when the property contains characteristics that fall into different quality categories. (Strachota Dep. at 164; Stockness Dep. at 87–89, 198–99.) Of particular importance here, the Nelsons' experts do not offer *any* criticism of the 360Value quality grades assigned to the Nelson Home by American Family, nor do they offer a replacement cost estimate for the property using 360Value. (*See* Stockness Dep. at 51, 64–65, 116–18; Strachota Dep. at 103, 167–70, 211–12.)

### 3. American Family's Gold Star Policies

One of the insurance products offered by American Family is the Gold Star home insurance policy. (*See* First Ellingboe Decl., Ex. 3 ("Nelson Policy") [Doc. No. 225-3].) In relevant part, Gold Star policies are distinct because they cover the total loss of a property up to 120% of the coverage amount. (*Id.* at Am. Fam. 066[7]; Olson Dep. at 20.) For instance, if an insured has $200,000 in coverage on a home, a Gold Star policy will

---

[7] The Court cites to the last three digits of the Bates stamp located in the lower right hand corner of the document when referencing the Nelson Policy.

pay up to $240,000 to replace the home in the event of a total loss. However, to receive the 20% coverage enhancement, the policyholder must maintain coverage on the property to a minimum of 100% of the replacement cost (known as "Coverage A"), as estimated by American Family.[8] (Nelson Policy at Am. Fam. 066.)

Gold Star policies explain the process for estimating replacement costs as follows:

Our residential building cost guide may be used to develop an estimated replacement cost based on general information about your dwelling. It is developed from researched costs of construction materials and labor rates. This is the minimum amount for which to insure your dwelling. The actual cost to replace your dwelling may be different. We do not guarantee that this figure will represent the actual cost to replace your dwelling. You are responsible for selecting the appropriate amount of coverage. You may wish to obtain a detailed replacement cost appraisal or estimate from a contractor. You may select a coverage amount equal to that appraised value or that cost of construction, if the amount is greater than the replacement cost as estimated by our residential building cost guide, and we agree to that amount.

(*Id.* at Am. Fam. 067 (hereinafter, the "Replacement Estimate Clause").) American Family uses 360Value as its "residential building cost guide" to estimate property replacement costs. (Olson Dep. at 30, 52.) This estimate serves as the minimum amount of coverage a Gold Star policyholder must maintain to receive the 20% coverage enhancement. (Nelson Policy at Am Fam. 066.)

Each year following the initial estimate, American Family uses its "residential building cost index" (which is distinct from 360Value) to adjust the amount of coverage to account for inflation on the replacement cost estimate. (*Id.* at Am. Fam. 048.) However, there is nothing within the Gold Star policies requiring American Family to

---

[8] For example, if American Family estimated the replacement cost of a property at $200,000, the homeowner must maintain at least $200,000 in coverage.

periodically reassess the estimated replacement cost (i.e., gather new/updated information about the property and produce a new 360Value report), or suggesting that American Family might engage in such an exercise. American Family explained that the property-specific information contained in 360Value is not automatically or annually updated. (*See* Olson Dep. at 31.) Instead, agents are expected to complete "annual personal insurance reviews" with customers wherein they discuss the appropriate/desired coverage amount with the insured. (Olson Dep. at 37, 145.) Insureds also must—within 90 days of starting the project—notify American Family of any remodeling/renovations to the home that will increase the replacement cost by $5,000 or more. (Nelson Policy at Am. Fam. 048, 066.)

An insured's premium payments may increase commensurate with any increase in coverage. (*See id.* at Am. Fam. 058.) Insureds are also expressly authorized to request changes to their Gold Star policies—such as the amount of Coverage A—although the requested changes are only effective if American Family agrees. (*Id.* at Am. Fam. 058, 067; *see* Olson Decl. at ¶ 11 (explaining that Gold Star policyholders "may request a new [replacement cost] estimate based on new or more complete information about the home" in which case the agent works with the insured to generate a new 360Value report); Olson Dep. at 153–54 (describing how policyholders may challenge American Family's minimum coverage assessments).)

### 4. The Millennium Surveys

Starting in 2009, American Family employed Millennium Information Services, Inc. ("Millennium") to conduct surveys of various Gold Star properties in an effort to

assess whether the existing coverage on each was adequate.[9]  (Olson Dep. at 34–35; Olson Decl. at ¶ 5.)  These surveys were part of American Family's ongoing efforts to ensure that the property information it used to generate replacement cost estimates was accurate.  They were also motivated by the financial losses American Family suffered in previous years because it has under-insured many properties.  (*See* Olson Dep. at 32–34, 127–29.)  Millennium would complete an exterior-only survey of a property and use the information it gathered to generate a 360Value replacement cost estimate (these Millennium-produced surveys and 360Value reports are collectively referred to as the "Millennium Reports").  (*See* Olson Dep. at 35–36, 123–24.)  The Millennium Reports were then submitted to American Family.  (Olson Decl. at ¶ 6.)

American Family's response to the Millennium Reports varied.  Every Millennium Report was provided to the property's agent who was expected to review those documents, assess whether a change in coverage was appropriate based on the additional information they had about the property (e.g., the interior characteristics of the property), and if appropriate, discuss coverage with the insured.  (Olson Decl. at ¶ 6; *see* Olson Dep. at 37, 58, 145–47, 204–05[10].)  However, there is no evidence that American Family simply accepted the Millennium Reports as the "best" or most accurate replacement cost

---

[9] Before hiring Millennium, American Family purchased similar services from another vendor ("Myriad").  (Olson Dep. at 115–16.)

[10] A specific portion of the Olson Deposition submitted by Plaintiffs was redacted.  (*See* Olson Dep. at 201–06.)  However, American Family later submitted these redacted sections in an unredacted form and not under seal.  (*See* Second Decl. of Deborah A. Ellingboe [Doc. No. 251], Ex. 52 [Doc. No. 251-7].)  For the sake of efficiency and clarity, the Court cites to the Olson Deposition generally, but readers should understand that pages 201–06 of that deposition can be found in docket Document Number 251-7.

estimates for properties, or adjusted coverage based solely on these Reports. (*See* Olson Dep. at 37–38 (explaining that American Family agents and underwriters assessed the Millennium Reports for accuracy and made the ultimate determinations regarding estimated replacement costs).)

In some instances, the Millennium Reports resulted in American Family conducting an underwriting review. One reason for an underwriting review was if the current Coverage A amount differed significantly from the Millennium estimated replacement cost (indicating potential over- or under-insurance). (*See* Olson Dep. at 189–90; Second Decl. of Elizabeth R. Odette in Supp. of Pls.' Opp. to Summ. J. ("Second Odette Decl.") [Doc. No. 246], Ex. 39 ("Am. Fam. Millennium Review Table") [Doc. No. 246-2].) Specifically, if Coverage A was less than 95% of the Millennium Report's estimated replacement cost (suggesting possible under-insurance) or if Coverage A was more than 150% of the Report's estimated replacement cost (suggesting possible over-insurance) an underwriter would review the file.[11] (Am. Fam. Millennium Review Table; *see* Olson Dep. at 203–04.)

During these reviews, the underwriter would collect information about the property and would use this more complete profile to generate a new 360Value replacement cost estimate. (Olson Dep. at 55, 128–29.) Notably, underwriters often consulted with agents and insureds in this process. (*See* Olson Decl. at ¶ 7; Olson Dep. at

---

[11] In the instances just described, an underwriting review was mandatory. However, if Coverage A was between 95% and 150% of the Millennium Report's estimated replacement cost, an underwriting review might still occur for other reasons. (*See* Olson Dep. at 205.)

63, 103–04, 128–29.) If after the underwriter concluded his/her review, Coverage A on the property was less than 95% of the new 360Value estimated replacement cost, the underwriter would recommend a coverage increase. (Am. Fam. Millennium Review Table; *see* Olson Dep. at 202 (explaining that even in these cases, coverage would not necessarily be increased).) If Coverage A was between 95% and 125% of the updated estimated replacement cost, the underwriter would recommend no change in coverage. (Am. Fam. Millennium Review Table.) If Coverage A were more than 125% of the updated estimated replacement cost, the underwriter would engage in varying efforts to have the coverage reviewed further by the agent and/or others within American Family, depending on the extent of the discrepancy. (*Id.*; *see* Olson Dep. at 205–06.) "Only in unusual circumstances [would] an underwriter adjust coverage without consulting with the agent and homeowner and never without providing notice of the change." (Olson Decl. at ¶ 7; *see* Olson Dep. at 145–46.)

## 5. The Nelsons' Experience

In 1990, the Nelsons finished construction on their new lake home in Monticello, Minnesota. (First Ellingboe Decl., Ex. 1 ("C. Nelson Dep.")[12] at 9 [Doc. No. 225-1].) They called their long-time American Family agent, Ron Baker ("Baker"), to obtain insurance on the property. (*Id.* at 11–12.) In consultation with Baker, Mr. Nelson

---

[12] The parties provided portions of Mr. Nelson's transcript in numerous individual filings. (*See* First Odette Decl., Ex. 4 [Doc. No. 215-2]; Second Decl. of Elizabeth Odette [Doc. No. 246], Ex. 34 [Doc. No. 246-2]; Second Decl. of Deborah A. Ellingboe [Doc. No. 251], Ex. 46 [Doc. No. 251-1].) For the sake of efficiency and clarity, the Court cites to the C. Nelson Deposition generally, but readers should understand that transcript pages from this deposition appear in these various documents.

selected a Gold Star policy, specifically because it provided the 20% coverage enhancement in the event of a loss.[13] (*Id.* at 37–38; *see* Nelson Policy at Am. Fam. 066.) However, at no time did the Nelsons review the Replacement Estimate Clause, nor did they discuss with Baker how American Family generated replacement cost estimates.[14] (*See* C. Nelson Dep. at 115–16.)

The Nelsons' Gold Star policy was renewed annually, at which time they received a declaration page stating the amount of Coverage A on their home (sometimes labelled as the "limit" for the "dwelling"). (*See, e.g.,* Nelson Policy at Am. Fam. 040–42 (declaration page and accompanying letter for renewal in 2005).) As described above, Coverage A increased each year to account for inflation. The Nelsons do not challenge or dispute *any* of the annual increases in coverage based on inflation. The Nelsons renewed their Gold Star policy, without any relevant incident or complaint, from 1990 through 2006.

By 2006, Coverage A on the Nelson Home was $240,200. (First Odette Decl., Ex. 15 at 14 [Doc. No. 215-2].) In December 2006, Baker ran a 360Value report on the Nelson Home, which generated an estimated replacement cost of $379,841.97. (2006 360Value Report; *see* Second Odette Decl., Ex. 37 ("Nelson Mainframe Notes") [Doc.

---

[13] Mrs. Nelson explained that Mr. Nelson primarily dealt with insurance matters and thus her exposure to the issues in this case was limited and usually secondhand. (*See* First Ellingboe Decl., Ex. 2 ("D. Nelson Dep.") at 11–13, 22, 34–36 [Doc. No. 225-2].) The Court cites her testimony where relevant, but largely relies on the testimony of Mr. Nelson.

[14] The parties did not provide the Court with the original estimated replacement cost for the Nelson Home, or indicate the initial amount of Coverage A for the property.

No. 246-2].) The Nelsons allege that the estimated replacement cost increased significantly because Baker changed the quality grade for the Nelson Home from "standard" to "above average."[15] (*See* 2006 360Value Report at Am. Fam. 001[16]; Pls.' Mem. in Opp. at 7–8, 10.) There is no explanation provided as to why Baker ran the December 2006 360Value report, or why the quality grade changed.[17] Mr. Nelson does not remember requesting that Baker generate a new replacement cost estimate, or ever being shown the December 2006 360Value Report before this litigation. (C. Nelson Dep. at 59–60.) Of considerable importance here, the Nelsons allege that the change in quality grade was a "mistake" and not the result of fraud or other nefarious motives. (Pls.' Mem. in Opp. at 7–8, 10; First Ellingboe Decl., Ex. 28 at 26–27 [Doc. No. 226-7].)

After running the December 2006 360Value report and receiving the higher estimated replacement cost, Baker sent a note to the Nelsons asking that they contact him about increasing their coverage. (First Ellingboe Decl., Ex. 17 ("Baker's Nelson Notes") [Doc. No. 225-17].) The Nelsons do not recall talking to Baker about an increase in coverage at this time, but do not dispute that he may have contacted them. (C. Nelson Dep. at 99–100.) In early January 2007, Baker sent the Nelsons a letter and declaration page informing them that Coverage A on their home would increase to $380,000 starting

---

[15] The parties did not provide the operative 360Value report for the Nelson Home before Baker ran the new report in December 2006.

[16] The Court cites to the last three digits of the Bates stamp located in the lower right hand corner of the document when referencing the 2006 360Value Report.

[17] Baker retired from American Family and neither party deposed him.

at the next renewal.[18]  (First Ellingboe Decl., Ex. 18 ("2007 Letter and Decl.") [Doc. No. 225-18].)  The letter indicates that Baker requested this change in coverage.  (*Id.* at Am. Fam. 082.[19])  Mr. Nelson agrees he received these materials, but does not recall specifically reviewing the change in coverage.  (C. Nelson Dep. at 99.)  The increase in coverage, and corresponding increase in premiums, took effect in February 2007. (Nelson Mainframe Notes; 2007 Letter and Decl. at Am. Fam. 084.)

In October 2007, as part of securing a reverse mortgage on the property, the Nelsons asked that American Family send their lender the declaration page for their Gold Star policy.  (C. Nelson Dep. at 100–03.)  American Family complied with this request and sent a copy to Mr. Nelson as well.  (Baker's Nelson Notes.)  Between 2009 and 2011, the Nelsons used the funds from the reverse mortgage in part to complete a variety of renovations to their home, including interior renovations that affected the estimated replacement cost for the property.  (C. Nelson Dep. at 26–28; D. Nelson Dep. at 36–37; Strachota Dep. at 209–11, 262–66; Stockness Dep. at 87, 145–46).  Although required by the Gold Star policy, there is no evidence in the record as to if or when the Nelsons notified American Family of these renovations.  (Nelson Policy at Am. Fam. 066.)  It is also unclear whether the Nelsons renovated their home at other times in ways that impacted the estimated replacement cost.

After 2007, Coverage A on the Nelson Home increased—accounting for

---

[18] The Nelsons' policy period ran from February to February, thus their 2007 policy year began in February 2007.  (*See* Nelson Policy at Am. Fam. 042.)

[19] The Court cites to the last three digits of the Bates stamp located in the lower right hand corner of the document when referencing the 2007 Letter and Declaration.

inflation—to the following amounts: $427,500 in 2008, $439,000 in 2009, $450,900 in 2010, and $454,500 in 2011. (*See* First Ellingboe Decl., Exs. 20–23 [Doc. Nos. 225-20, 225-21, 226-1, 226-2].) Mr. Nelson assumes he received the declaration pages showing these annual increases, although he admits he did not review them closely. (C. Nelson Dep. at 96, 130–31.) The Nelsons never complained about or questioned the coverage amount on their home until early 2011, after they received the declaration page stating the new coverage amount for that year. (*Id.* at 62–63, 110–11, 151.)

In September 2010, Millennium conducted an exterior-only survey of the Nelson Home. (First Odette Decl., Ex. 19 ("2010 Millennium Survey") [Doc. No. 215-2].) The survey assigned the property an "overall quality" of "standard." (*Id.* at Am. Fam. 008.[20]) The corresponding Millennium 360Value report set the quality grade as "standard" and estimated the replacement cost at $315,023.55 (the Millennium survey and 360Value report will collectively be referred to as the "Millennium Nelson Report"). (2010 Millennium 360Value Report.) Besides 360Value's "default" setting for quality grades, described above, there is no evidence as to how these quality assessments were made. American Family reviewed the Millennium Nelson Report in December 2010 and concluded that the current coverage amount for the Nelsons' home—$450,900—was acceptable. (Nelson Mainframe Notes.) The Millennium Nelson Report was never discussed with—or shown to—the Nelsons until this litigation commenced. (C. Nelson Dep. at 60–61.)

---

[20] The Court cites to the last three digits of the Bates stamp located in the lower right hand corner of the document when referencing the 2010 Millennium Survey.

In February 2011, Mr. Nelson called Baker and complained that the coverage on the property far exceeded its value. (*Id.* at 60–63; Nelson Mainframe Notes.) Baker agreed to discuss this issue with the Nelsons and drove out to the Nelson Home the next day. (C. Nelson Dep. at 61–62.) The Nelsons recall that this was a short meeting and that Baker did not inspect their home, nor did he mention the Millennium Nelson Report. (*Id.* at 60–61, 66–67, 114–15; D. Nelson Dep. at 16–18.) However, at the end of the meeting, Baker crossed out the $454,500 Coverage A amount on the declaration page and wrote in $315,000. (C. Nelson Dep. at 66, 114; D. Nelson Dep. at 18.) Mr. Nelson recalls asking Baker how he came up with the $315,000 figure to which Baker replied that he "just knew" based on his years of experience. (C. Nelson Dep. at 66, 114.) Mr. Nelson also claims that Baker told him something to the effect that American Family reviewed properties that were "under-estimated," but that those that were "over-estimated" often "slid by." (C. Nelson Dep. at 154–56.) Days later, American Family's records indicate that Coverage A on the Nelson Home was reduced to $315,000, citing the Millennium Nelson Report as support for the decrease. (Nelson Mainframe Notes.)

The Nelsons asked that American Family refund the difference between the premiums they paid on the "over coverage" that began in 2007 and the premiums that they would have paid had a "more accurate" replacement cost estimate been used. (*See* C. Nelson Dep. at 65–66.) American Family reimbursed the Nelsons this difference for the premiums they paid in 2011, before the change in coverage, but refused to refund the difference for the premiums paid from 2007 through 2010. (*See id.*) The Nelsons maintained their Gold Star policy—which they hold to this day—and they do not contend

that the coverage amount has been too high since the change in 2011, or that it was too high before 2007. (C. Nelson Dep. at 148–49.)

## B. Procedural History

The Nelsons brought claims on behalf of themselves and others who allegedly over-paid on their Gold Star premiums because of inaccurate replacement cost estimates. (*See* Am. Compl. [Doc. No. 42.].) The Nelsons allege that American Family was contractually obligated to annually update the estimated replacement costs of Gold Star properties, but failed to do so, and that as a result, American Family induced insureds to purchase excessive coverage. (*Id.* at ¶¶ 1, 4–5.) They also contend that American Family changed quality grades without the insureds' knowledge or consent and without justification for doing so. (*Id.* at ¶¶ 18, 28.) The Nelsons also argue that American Family's practices, or lack thereof, constituted deceptive trade practices and false statements in advertising. (*Id.* at ¶¶ 6, 8.) Specifically, the Nelsons brought claims for breach of contract, negligent misrepresentations, and violations of Minnesota's deceptive trade practices and consumer fraud statutes. (*Id.* at ¶¶ 43–70.)

American Family moved for summary judgment on the Nelsons' individual claims while Plaintiffs moved to certify various classes of plaintiffs. (*See* Mot. for Summ. J.; Mot. for Class Cert.) Both sides also brought *Daubert* challenges against the other's expert witnesses. (*Daubert* Mots.)

## II.   DISCUSSION

### A.  Legal Standard

Summary judgment is proper if, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); *Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1107 (8th Cir. 2016).   "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed.  *Id.* at 323.   However, a party opposing summary judgment "'may not rest upon the mere allegation or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial,' and 'must present affirmative evidence in order to defeat a properly supported motion for summary judgment.'"  *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016) (quoting *Anderson*, 477 U.S. at 256–57).   Summary judgment is also proper where the non-moving party fails "'to make a showing sufficient to establish the existence of an element essential to that party's case . . . .'"  *Walz v. Ameriprise Fin., Inc.*, 779 F.3d 842, 844 (8th Cir. 2015) (quoting *Celotex*, 477 U.S. at 322).

"[T]he nonmoving party must 'do more than simply show that there is some

metaphysical doubt as to the material facts.'" *Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 910 (8th Cir. 2010) (quoting *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Self-serving affidavits alone cannot defeat a properly supported motion for summary judgment. *Conolly v. Clark*, 457 F.3d 872, 876 (8th Cir. 2006). Rather, a plaintiff "must substantiate [self-serving] allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005). However, a party cannot create an issue of fact by simply offering an affidavit that contradicts his/her earlier sworn testimony. *Taylor v. Cottrell, Inc.*, 795 F.3d 813, 818 (8th Cir. 2015) ("We do not permit a post-deposition affidavit to contradict prior testimony in an attempt to create issues of fact. But an affidavit may be submitted to clarify ambiguities or confusion in deposition testimony." (citations omitted)).

### B. Breach of Contract

In general, contracts consist of binding promises and a breach of contract is "a failure, without legal excuse, to perform any promise that forms the whole or part of the contract." *Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014). "A successful breach-of-contract claim under Minnesota law has four elements: (1) formation of a contract; (2) performance by plaintiff of any conditions precedent; (3) a material breach of the contract by defendant; and (4) damages." *Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.*, 703 F.3d 1104, 1107 (8th Cir. 2013) (citation omitted).

The Nelsons argue that American Family breached its promises under the Gold

Star policy by failing to "reasonably" estimate the replacement cost of their home from 2007 through 2010. (*See* Pls.' Mem. in Opp. at 18–26.) As a result, they claim that they suffered damages in the form of the premiums they paid for inflated coverage during this period. (*Id.* at 27–30.)

The Nelsons' breach of contract claim fails for at least three reasons. First, the promises the Nelsons allege American Family made related to replacement cost estimates are not found in the Gold Star policy. Second, even assuming these promises can be inferred, there is no evidence that American Family breached those obligations. Third, the Nelsons did not suffer any damages. The Court addresses each reason in turn.

### 1. Promises in the Gold Star Policies

The Nelsons argue that in their Gold Star policy, American Family promised to "(a) make reasonable estimates of replacement costs and (b) set coverage accordingly." (Pls.' Mem. in Opp. at 22; s*ee id.* at 5–6, 25–26, 27.) They also claim that American Family had "a contractual obligation to review its estimate of a home's replacement cost and adjust coverage as necessary . . . ." (Pls.' Mem. in Opp. at 6; *see* Am. Compl. at ¶ 1 (alleging that the Gold Star policies "provide for automatic updating of the replacement cost and corresponding coverage limits"); Decl. of Charles P. Nelson ("C. Nelson Decl.") at ¶ 4 [Doc. No. 241].) The Nelsons contend that to the extent these promises are ambiguous in the contract, that ambiguity should be resolved in their favor. (Pls.' Mem. in Opp. at 20–22.)

"General principles of contract interpretation apply to insurance policies." *Carlson v. Allstate Ins. Co.*, 749 N.W.2d 41, 45 (Minn. 2008). Where the contract's

terms are clear or unambiguous, they are given their ordinary meaning. *Id.* A term is ambiguous "if it is susceptible to two or more reasonable interpretations." *Id.* "Ambiguity in an insurance policy is generally construed against the insurer." *In re SRC Holding Corp.*, 545 F.3d 661, 666 (8th Cir. 2008). However, it is the Court's duty to "fastidiously guard against the invitation to create ambiguities where none exist." *Id.* (quoting *Columbia Heights Motors, Inc. v. Allstate Ins. Co.*, 275 N.W.2d 32, 36 (Minn. 1979)). As part of this effort, "[e]xtrinsic evidence of the parties' subjective intent cannot be used to create contractual ambiguity where none exists on the face of the policy." *Id.* "Although extrinsic evidence may *support* a finding of ambiguity when insurance contract language is ambiguous on its face, we generally do not rely on extrinsic evidence to *establish* contractual ambiguity." *Wilcox v. State Farm Fire & Cas. Co.*, 874 N.W.2d 780, 784 (Minn. 2016) (citations omitted) (emphasis in original).

Nowhere in the Gold Star policy does American Family promise to "automatically" or "periodically" re-estimate the Nelson Home's replacement cost.[21] It is true that the Gold Star policy obligates American Family to make annual adjustments to coverage to account for inflation, but this is not a promise to regularly generate new replacement cost estimates. (*See* Nelson Policy at Am. Fam. 048, 066.) Instead, the policy places the burden on the insureds to notify American Family if they make a substantial improvement to the property. (*Id.*) There is no ambiguity to resolve in the

---

[21] Of course, the fact that American Family was not contractually obligated to engage in periodic estimated replacement cost updating does not mean it was prohibited from doing so. (*See* Nelson Policy at Am. Fam. 066–67 (placing no restrictions on if or when American Family may update a replacement cost estimate).)

Nelsons' favor. They cannot impose a contractual duty on American Family that does not exist by conflating policy provisions regarding the estimation of replacement costs with those directing annual inflation-based adjustments in coverage. *See Eng'g & Const. Innovations, Inc. v. L.H. Bolduc Co.*, 825 N.W.2d 695, 705 (Minn. 2013) ("We will not adopt a construction of an insurance policy which entirely neutralizes one provision if the contract is susceptible of another construction which gives effect to all its provisions and is consistent with the general intent."); *Bd. of Regents of Univ. of Minn. v. Royal Ins. Co. of Am.*, 517 N.W.2d 888, 893 (Minn. 1994) ("words are deliberately chosen in insurance policies to make distinctions").

Mr. Nelson's Declaration, made more than two years after he was deposed and in opposition to summary judgment—in which he claims for the first time that Baker "explained to us in general terms that [American Family] would from time to time reevaluate the replacement cost for our home and adjust coverage accordingly"—also does not create a contractual obligation. (*See* C. Nelson Decl. at ¶ 4.) First, this is the sort of unsupported, self-serving declaration that cannot defeat a properly supported motion for summary judgment. *See Davidson & Assocs.*, 422 F.3d at 638. Second, Mr. Nelson's late-coming declaration appears to contradict his early deposition testimony, wherein he suggested that Baker never discussed replacement cost estimates with him. (*See* C. Nelson Dep. at 115–16.) Such attempts to create a factual dispute are not permitted. *See Taylor*, 795 F.3d at 818.

Third, Mr. Nelson appears to conflate American Family's contractual obligation to make annual inflation-related adjustments with a duty to periodically update a property's

replacement cost estimate. (*See* C. Nelson Decl. at ¶ 5, 9 (indicating that Mr. Nelson understood that the annual "adjustments" were related to inflation).) As just described, American Family's duty to annually adjust coverage to account for inflation is distinct from the estimated replacement cost issue underlying the Nelsons' claims. Fourth, the Court may not consider Mr. Nelson's claims about what Baker allegedly represented to him—which amounts to impermissible parol evidence—to create ambiguity in the Gold Star policy. *In re Minnesota Mut. Life Ins. Co. Sales Practices Litig.*, 346 F.3d 830, 837 (8th Cir. 2003) ("We find that the policies are unambiguous and that any enforcement of the alleged promises made by [the insurer] through the use of sales illustrations would violate the parol evidence rule and must be disregarded. Without the benefit of parol evidence, [the insured] can point to no terms of the written policy that have been breached."); *see In re SRC Holding Corp.*, 545 F.3d at 666; *Wilcox*, 874 N.W.2d at 784.

Similarly, there is no evidence that American Family contractually promised to make "reasonable" replacement cost estimates and set coverage accordingly.[22] The

---

[22] The Nelsons contend that American Family assumed a contractual duty to reasonably estimate the replacement cost of their home because they were essentially "required" to accept American Family's estimate, elect coverage in a commensurate amount, and had no means to challenge the estimate. (*See* Pls.' Mem. in Opp. at 23, 25–26.) But, this contention is also not supported by the record. It is true that in order to receive the 20% coverage enhancement in the event of a loss, the Nelsons had to insure their home to 100% of American Family's estimated replacement cost. (Nelson Policy at Am. Fam. 066.) However, the Gold Star policy also allowed them to request changes to their policies and to challenge American Family's estimates, although American Family was free to deny those challenges. (*See id.* at Am. Fam. 058, 067.) The Nelsons exercised this right when they challenged the coverage amount on their home in 2011 and American Family responded by lowering the coverage. Moreover, even if American Family refused to reduce the required coverage amount, the Nelsons could simply cancel their policy—or decline to renew it—and obtain insurance elsewhere.

policy is devoid of any language promising "reasonable" replacement cost estimates. This is unsurprising given that estimating the replacement cost of a property is inherently variable and based in significant part on the subjective judgments of an assessor. *See supra* Part I.A.1–2. The Gold Star policy speaks to the uncertainty surrounding these estimates. (Nelson Policy at Am. Fam. 067; *see* C. Nelson. Dep. at 55–58 (agreeing that replacement cost estimates are necessarily imprecise to some degree because they attempt to predicate a future cost that is subject to numerous unknown variables).) In fact, there is no language in the Gold Star policy—besides the Replacement Estimate Clause—that in any way limits or restricts American Family's discretion when estimating the replacement cost of a home.

### 2. Breach of the Covenant of Good Faith and Fair Dealing

The Nelsons allege that American Family breached the "doctrine of reasonable expectations" by assigning an inaccurate quality grade to their home and basing coverage on the resulting replacement cost estimate from 2007 through 2010. (*See* Am. Compl. at ¶¶ 18, 28; Pls.' Mem. in Opp. at 20, 25–26.) Specifically, the Nelsons argue that they reasonably expected that American Family would "take reasonable precautions to assure that its annual estimates of replacement cost were accurate" and that American Family would ensure that the property information it used—such as the quality grade—was "reasonably accurate or complete." (*See* Pls.' Mem. in Opp. at 25–26.) However, the doctrine of reasonable expectations is a narrowly defined, judicially created doctrine that has no application here. *See Babinski v. Am. Family Ins.*, 569 F.3d 349, 353 (8th Cir. 2009) (holding that the doctrine of reasonable expectations "applies only on the few

'egregious' occasions when an exclusion is disguised in a policy's definitions section" (citations omitted)).  Rather, the Nelsons' argument would seem to implicate the covenant of good faith and fair dealing.  *See* Jay M. Feinman, *Good Faith and Reasonable Expectations*, 67 Ark. L. Rev. 525 (2014) (explaining that the covenant of good faith and fair dealing is meant to preserve the reasonable expectations of parties to a contract).

An implied covenant of good faith and fair dealing exists in every contract.  *In re Hennepin Cty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995); *Constr. Sys., Inc. v. Gen. Cas. Co. of Wisconsin*, No. 09-cv-3697 (RHK/JJG), 2011 WL 3625066, at *9 (D. Minn. Aug. 17, 2011) ("Good faith and fair dealing is an implied covenant in every contract under Minnesota law including insurance contracts.").  In general terms, this covenant requires that "one party not unjustifiably hinder the other party's performance of the contract."  *In re Hennepin Cty.*, 540 N.W.2d at 502.  "The implied covenant of good faith and fair dealing serves only to enforce *existing* contractual duties, and *not* to create new ones."  *Watkins Inc. v. Chilkoot Distrib., Inc.*, 719 F.3d 987, 994 (8th Cir. 2013) (emphasis added).  Moreover, "the covenant is breached only by conduct that is dishonest or malicious or otherwise in subjective bad faith."  *BP Prod. N. Am., Inc. v. Twin Cities Stores, Inc.*, 534 F. Supp. 2d 959, 965–67 (D. Minn. 2007) (examining Minnesota case law and concluding that the substantial weight of authority requires subjective bad faith for a breach).

The Nelsons' claim for breach of good faith and fair dealing fails for at least three reasons: (1) there is no evidence of bad faith by American Family; (2) the covenant of

good faith and fair dealing does not impose on American Family a contractual duty of objective reasonableness as to the estimation of replacement costs; and (3) there is no evidence that American Family acted unreasonably when estimating the replacement cost of the Nelson Home.

*BP Products North America* is informative on each of these issues. There, defendants ("TCS") contracted with plaintiff ("BP"), to sell BP's gasoline at various stores around Minnesota. *BP Prod. N. Am.*, 534 F. Supp. 2d at 960. The contract gave BP the right to set the retail price of gasoline at TCS stores. *Id.* "Nothing in the [contract] limited BP's price-setting discretion in any way." *Id.* For a short time, BP decided to set gas prices a few cents higher than the competition. *Id.* at 961. TCS brought a counterclaim against BP alleging, in relevant part, that BP breached the implied covenant of good faith and fair dealing because this price increase was "unreasonable." *Id.* at 965.

The Honorable Patrick J. Schiltz, in a well-reasoned opinion, rejected TCS's claim based on the covenant of good faith and fair dealing. *Id.* at 967–68. First, Judge Schiltz held that a breach of the covenant requires evidence of dishonesty, maliciousness, or subjective bad faith. *Id.* at 965. He explained:

> Countless contracts give one party the discretion to control some aspect of the parties' relationship. The implied covenant of good faith and fair dealing prevents the party with control from abusing its discretion in a manner that would inflict harm on the vulnerable party and undermine the purpose of the contract. In exercising discretion under a contract, a party must use "faith" that is "good." This speaks not of objective reasonableness, but of subjective motivation.
>
> Reading into the implied covenant a duty to act with objective

reasonableness—or, put differently, holding that the implied covenant can be breached by good-faith mistakes—would require courts to litigate a huge number of contractual disputes under tort-like standards.

*Id.* Judge Schiltz also noted that understanding the covenant to impose an objective reasonableness standard would render superfluous the clauses in many contracts, including the one between TCS and BP, requiring the parties to act "reasonably"—a term defined in the contract. *Id.* at 965–66.

Turning to the facts before him, Judge Schiltz found that although BP's pricing strategy was "dumb"—in that it was unsuccessful and resulted in lower sales—there was no evidence of any subjective bad faith, such as an effort to target TCS, or punish TCS for a perceived slight. *Id.* at 967. In fact, TCS conceded that there was no evidence BP acted with an improper purpose. *Id.* at 968. Judge Schiltz continued:

Even if TCS were correct that BP could violate the implied covenant by acting unreasonably (but in good faith) in setting gasoline prices, there is no evidence from which a jury could conclude that BP's conduct was, in fact, unreasonable. The Court rejects TCS's assertion that BP could violate its duty of good faith merely by having the highest gasoline prices on a particular day. And the Court rejects as preposterous the suggestion of TCS's expert witness that BP acted unreasonably—and thus breached the [contract]—any time that its gasoline was not the lowest priced gasoline on the market. Given the normal ebb and flow of the market—in which gasoline prices vary from locale to locale, store to store, day to day, and even hour to hour—TCS must prove something more than that BP did not always have the lowest price—or once in a while had the highest price—in order to prove that BP acted unreasonably.

…

Without evidence that BP acted unreasonably in trying a new pricing strategy, a jury could not return a verdict for TCS, even if the Court were to agree with TCS that a party to a contract can violate the good-faith covenant while acting in good faith.

*Id.*

Here, the Nelsons' good faith and fair dealing claim fails for reasons similar to those in *BP Products North America*. First, there is no allegation—let alone any evidence—of bad faith or malicious intent by American Family. Rather, the Nelsons argue that American Family's "failings"—first in changing the quality grade of the Nelson Home in December of 2006 and later in not adjusting the estimated replacement cost of the property upon receiving the Millennium Nelson Report—were, at most, the result of negligence. (Pls.' Mem. in Opp. at 7–8, 10; First Ellingboe Decl., Ex. 28 at 26–27 [Doc. No. 226-7].) Even assuming that American Family's change to the quality grade of the Nelson Home and decision to maintain the coverage amount after receiving the Millennium Nelson Report were imprudent, this is not evidence of bad faith. *See BP Prod. N. Am.*, 534 F. Supp. 2d at 967. With no bad faith, there is no breach of the covenant of good faith and fair dealing, and thus the Nelsons' claim must be dismissed. *See id.* at 965–68.

Second, besides requiring that American Family use 360Value to estimate the replacement cost of a property, the Gold Star policy places no other limit or requirement on American Family's discretion. (Nelson Policy at Am. Fam. 066–67.) Notably, there is no provision regarding how American Family will determine the quality grade for a home, or even what specific information about the home American Family must use when generating an estimated replacement cost. (*Id.* at 067 (explaining that American Family uses "general information" about a home to generate an estimated replacement cost).) In short, American Family was under no contractual duty to estimate replacement

costs with objective reasonableness. The covenant of good faith and fair dealing prohibits American Family from acting in bad faith, but it cannot serve to impose an objective reasonableness standard on American Family. *See Watkins*, 719 F.3d at 994; *BP Prod. N. Am.*, 534 F. Supp. 2d at 965.

Third, even assuming that American Family was required to calculate a "reasonably accurate" estimated replacement cost for the Nelson Home, there is no evidence that American Family breached this obligation. The Nelsons allege that American Family's December 2006 decision to change the quality grade of their home in December of 2006 was unreasonable, but they point to no evidence supporting this allegation. The Nelsons' experts agree that determining the quality grade for a property involves the subjective judgment of the insurer/appraiser. *See supra* Part. I.A.2. However, they offer no criticism of the quality grades that American Family assigned to the Nelson Home. *Id.* In fact, the Nelsons' experts are not even familiar with 360Value's quality grade definitions, or the difference between the grades. (Strachota Dep. at 169–70; Stockness Dep. at 117–18.) Thus, they could not opine on what a "reasonable" or "accurate" 360Value quality grade was for the Nelson Home. (*See* Strachota Dep. at 170.)

The Nelsons' expert report—which assigned a quality grade of "average to good" to the Nelson Home when it was assessed in 2015—is not evidence that American Family's 360Value quality grading was unreasonable. (*See* First Ellingboe Decl., Ex. 30 ("Shenehon Nelson Estimate") [Doc. No. 226-9].) The Nelsons' experts used the Marshall valuation program, which has a different quality grade scale than 360Value, and

there is no evidence comparing these scales or how quality grades are assigned by each program. *See supra* Part I.A.2. For instance, there is no evidence explaining how a Marshall quality grade of "average to good" compares to a 360Value quality grade of "standard" or "above average." Without this evidence, a fact-finder could not make a reasonableness determination based solely on the fact that the Nelsons' experts assigned a different quality grade to the property using a different valuation program. Furthermore, there is no expert evidence as to what the "reasonable" Marshall quality grade was for the Nelson Home from 2007 through 2010; instead, the Nelsons' expert report assesses that grade as of 2015.

The Nelsons also point to 360Value's ten percent margin of error as evidence that the replacement cost estimate for their home was inaccurate and unreasonable. (Pls.' Mem. in Opp. at 10–16, 23.) It is true that 360Value's estimated replacement costs are believed to be "accurate" in the sense that the actual cost to rebuild a property would be within plus or minus ten percent—or less, depending on the amount of the property-specific information provided—of the estimate. (*See* First Ellingboe Decl., Ex. 31 [Doc. No. 226-10].) However, this fact is irrelevant to the issue that controls the Nelsons' claim. The margin of error analysis assumes that the appropriate quality grade—and other key characteristics about the property—is provided to 360Value. (*See id.* at 10–13, 30–32[23]; Stockness Dep. at 194–95, 219–20.) The Nelsons' only challenge to the 360Value estimate is that the quality grade was not appropriately assessed.

_____

[23] The Court cites to the ECF page numbers as they appear in the upper right hand corner of this exhibit.

### 3. Damages

The Nelsons claim that they suffered damages in the form of excessive premiums paid for "illusory coverage" from 2007 through 2010. (Pls.' Mem. in Opp. at 27–30.) Specifically, they argue that the Gold Star policy limited the amount they would receive in the event of a total loss to what it actually cost to rebuild the property, regardless of the amount of Coverage A. (*Id.* at 27–29.) If the actual replacement cost for their home never exceeded Coverage A, they argue that they paid for "illusory" coverage. For instance, the Nelsons posit that if their home had been destroyed in 2008 and cost $350,000 to rebuild, American Family would have paid a maximum of $350,000 on their claim despite there being $427,500 of Coverage A on the property. However, under Minnesota law, the Nelsons are not correct. If their home had been destroyed in 2008, the Nelsons would have received $427,500 regardless of the actual cost to rebuild.[24]

"Liability for breach of contract requires proof that damages resulted from or were caused by the breach." *Border State Bank of Greenbush v. Bagley Livestock Exch., Inc.*, 690 N.W.2d 326, 336 (Minn. Ct. App. 2004); *see Gen. Mills Operations*, 703 F.3d at 1107. In general, an insurer is entitled to retain the premiums paid by an insured once those premiums are "earned," meaning when the insurer assumed the risk set forth in the policy. *In re Millers' & Mfrs. Ins. Co.*, 106 N.W. 485, 494 (Minn. 1906); *see In re Texas Ass'n of Sch. Boards, Inc.*, 169 S.W.3d 653, 659 (Tex. 2005) ("[T]here is no premium

---

[24] During oral argument, American Family agreed that by virtue of the Gold Star policy and Minnesota law, it has at all times been obligated to—in the event of a total loss—pay the Nelsons at least the amount of Coverage A on their home at the time. (*See* Hr'g Tr. dated 3/15/2017 at 43–44, 75–76, 89–91 [Doc. No. 265].)

due until risk attaches, and once risk has attached premiums have been earned and are non-returnable, absent a statutory or contract provision to the contrary."); *Dornberger v. Metro. Life Ins. Co.*, 961 F. Supp. 506, 539 (S.D.N.Y. 1997) ("[I]t would be inequitable to permit the insured to have received the benefit of past coverage without cost and to permit the insurer no compensation for the time it was at risk."); *Humana Health Care Plans v. Snyder-Gilbert*, 596 N.E.2d 299, 300 (Ind. Ct. App. 1992) ("It is axiomatic that a court cannot award a refund of premiums paid to secure insurance once the insurance company has been put at risk on behalf of the insured." ).

The Nelsons are correct that their Gold Star policy contains a clause that purports to limit the amount American Family will pay in the event of a total loss to the lesser of (1) the actual amount spent rebuilding the home, or (2) the cost to replace the home with "like construction for a similar use on the premises[.]" (Nelson Policy at Am. Fam. 052.) However, the policy also explains that if its terms conflict with state law, the terms are altered to conform to the law. (*Id.* at 057.) There is also a clause explaining that for homes insured in Minnesota, "the limit for Coverage A – Dwelling represents the total value of [the property]." (*Id.* at 053.)

Minnesota is a "valued policy" state, meaning that an insurer must pay the full amount of coverage in the event of a total loss, regardless of any policy provisions to the contrary or what it actually costs to rebuild the property. Minn. Stat. §§ 65A.08, subd. 2(a) ("the insurer shall pay the whole amount mentioned in the policy or renewal upon which it receives a premium, in case of total loss"), 65A.01, subd. 5 ("No provision shall be attached to or included in such policy limiting the amount to be paid in case of total

loss on buildings by fire, lightning or other hazard to less than the amount of insurance on the same.").  "Under a valued policy law, the insurer is less apt to set an excessively high insurable value because when a total loss occurs, the insurer must pay that insurable value and cannot reduce the amount of recovery."  *Auto-Owners Ins. Co. v. Second Chance Investments, LLC*, 827 N.W.2d 766, 769–70 (Minn. 2013).  Insurers are also prohibited from knowingly providing coverage in excess of a home's replacement cost, but if they do and a total loss occurs, insurers still must pay the full coverage amount. Minn. Stat. §§ 65A.09, 65A.13.

Accordingly, the coverage on the Nelson Home from 2007 through 2010 was not in fact "illusory," but rather entirely real.  By operation of law, if the Nelson Home were destroyed in 2008, the Nelsons would have received $427,500 from American Family (the amount of Coverage A on the property at the time), even if it only cost $350,000 to rebuild the home.  Since American Family at all relevant times assumed the risk represented by the Coverage A amount on the Nelson Home, it is entitled to keep the premiums the Nelsons paid.  With no entitlement to these premiums, the Nelsons have no damages.

## C. Negligent Misrepresentation

Under Minnesota law, a claim for negligent misrepresentation consists of:

(1) a duty of care owed by the defendant to the plaintiff; (2) the defendant supplies false information to the plaintiff; (3) justifiable reliance upon the information by the plaintiff; and (4) failure by the defendant to exercise reasonable care in communicating the information.

*Williams v. Smith*, 820 N.W.2d 807, 815 (Minn. 2012).  The plaintiff must also produce

evidence that he/she suffered a pecuniary loss (i.e., damages) as a result of the misrepresentation. *Id.*; *Evelyn I. Rechtzigel Trust ex rel. Rechtzigel v. Fid. Nat. Title Ins. Co. of N.Y.*, 748 N.W.2d 312, 321–22 (Minn. Ct. App. 2008) (upholding dismissal of negligent misrepresentation claim for failure to show pecuniary loss).

The Nelsons' negligent misrepresentation claim fails for at least two reasons. First, there is no evidence that American Family supplied false information to the Nelsons or failed to exercise reasonable care in supplying them with that information. Second, the Nelsons suffered no damages.

### 1. Duty

When an insurer provides information for the purpose of guiding an insured in a business transaction—such as an insurance policy—the insurer must "exercise reasonable care or competence in obtaining or communicating the information." *See Williams*, 820 N.W.2d at 815; *Florenzano v. Olson*, 387 N.W.2d 168, 175 (Minn. 1986). Insurers have a duty to "exercise the skill and care which a reasonably prudent person engaged in the insurance business would use under similar circumstances. An insurance agent's duty is ordinarily limited to the duties imposed in any agency relationship, to act in good faith and follow instructions." *Gabrielson v. Warnemunde*, 443 N.W.2d 540, 543 (Minn. 1989) (citations omitted); *see Hebrink v. Farm Bureau Life Ins. Co.*, 664 N.W.2d 414, 420 (Minn. Ct. App. 2003) (applying this standard to a claim of negligent misrepresentation against an insurer). However, absent special circumstances, insurers do *not* owe insureds a duty to update their policies upon each renewal, or to inquire as to whether any changes occurred to the insured's property. *Gabrielson*, 443 N.W.2d 540 at

542. Special circumstances where such a duty might be owed include "a disparity of business experience and invited confidence, a long-standing insurance relationship, and when the insured asks the agent to examine the insured's exposure and advise the insured on the potential exposure[.]" *Herzog v. Cottingham & Butler Ins. Servs., Inc.*, No. A14-0528, 2015 WL 134043, at *3 (Minn. Ct. App. Jan. 12, 2015) (citations and alterations omitted).

The Nelsons argue that American Family had a specific duty to periodically update replacement cost estimates and possibly to disclose the documents it relied on in that process. (*See* Pls.' Mem. in Opp. at 37–38.) However, the case law directly contradicts the Nelsons' position. *See Gabrielson*, 443 N.W.2d 540 at 544 ("Once a policy has been issued, the insurance agent has only a limited duty to update the insurance policy. The agent has no ongoing duty of surveillance . . . . The insured bears the responsibility to inform the agent of changed circumstances which might affect the coverage of the insurance policy, because the insured is in a better position to communicate those changes than the agent could be expected to discover on his or her own initiative." (citations omitted)). Thus, American Family did not have a duty to periodically update the replacement cost estimate for the Nelson Home, or provide the Nelsons with the documentation used in that process.

### 2. False Information and Lack of Reasonable Care

The Nelsons clearly believe that the estimated replacement cost American Family used to set the minimum coverage amount on their home from 2007 through 2010 was inaccurate. Specifically, they argue that the quality grade assigned to the property during

that time was incorrect. However, the Nelsons offer no evidence that supports these arguments.

Generally speaking, an insurer must exercise the skill and caution of a "reasonably prudent person in the insurance business" when providing information to an insured regarding an insurance policy. *Hebrink*, 664 N.W.2d at 420. "When the standard-of-care issue goes beyond what an insurance agent should do when clearly requested, to the broader issue of affirmative duties where no request has been made, the issue centers around the professional judgment of the agent, requiring that the standard of care be established by expert testimony." *Philter, Inc. v. Wolff Ins. Agency, Inc.*, No. A10-2230, 2011 WL 2750709, at *3 (Minn. Ct. App. July 18, 2011); *see Gabrielson*, 443 N.W.2d at 545 (describing expert testimony as "important" to establishing the standard of care for an insurer).

The Nelsons' evidence simply does not support their claim that the replacement cost estimate for their home was objectively incorrect, or that American Family negligently misrepresented that estimate to them. Noticeably lacking is any expert evidence that American Family breached its duty to provide a "reasonably accurate" replacement cost estimate for the Nelson Home. *See Philter*, 2011 WL 2750709 at *3 (requiring such expert testimony). Instead, the Nelsons' evidence consists of: (1) expert testimony estimating a lower replacement cost for the Nelson Home during the relevant period; (2) the ten percent margin of error associated with 360Value replacement cost estimates; (3) the fact that American Family did not adjust coverage upon receiving the Millennium Nelson Report in 2010; and (4) the fact that American Family later agreed to

lower coverage from approximately $450,000 to $315,000 in early 2011 after the Nelsons complained. The Court addresses each piece of evidence in turn.

As previously discussed, the fact that the Nelsons' experts came up with lower replacement cost estimates for the Nelson Home—using a valuation system other than 360Value and a quality grade they assigned in 2015—is not evidence that American Family's estimated replacement costs constituted negligent misrepresentations. *See supra* Part I.A.2, II.B.2. These experts offer no criticism of the quality grades assigned by American Family, do not question the general reliability of 360Value or American Family's use of that valuation software, and they are unfamiliar with how quality grades are assigned using 360Value. *See supra* Part I.A.2. Notably, the Nelsons' experts agree that quality grades depend on the subjective judgment of the insurer/appraiser and that reasonable insurers/appraisers might disagree about the appropriate quality grade for a home. *See id.* Missing from the record is *any* evidence that, despite these facts, American Family's estimated replacement cost for the Nelson Home was unreasonable, let alone a negligent misrepresentation.

The ten percent margin of error for 360Value estimated replacement costs assumes that the appropriate or proper quality grade is used. *See supra* II.B.2. If the Nelsons' claim were that despite using accurate property-specific information, 360Value generated an inaccurate estimated replacement cost due to some inherent flaw within the software (i.e., that 360Value was an unreasonable means of estimating replacement costs), the margin of error would be relevant. But, the Nelsons raise no such challenge. Instead, the Nelsons' claim is that the quality grade was not accurately assessed, making the margin

38

of error irrelevant.

The fact that American Family did not adjust coverage on the Nelson Home upon receiving the Millennium Nelson Report is not, by itself, evidence that it acted unreasonably. As previously explained, American Family did not automatically accept the Millennium Reports as the appropriate or "true" estimated replacement cost. *See supra* Part. I.A.4. The Millennium Nelson Report was based on an exterior-only survey of the property and did not account for any interior features. When Millennium surveyed the Nelson Home in 2010, it was after the Nelsons completed interior renovations that their experts agree affected the property's estimated replacement cost. *See supra* at Part I.A.5. Presumably, American Family was aware of these improvements, but Millennium was not. *Id.* The record is devoid of any evidence, let alone expert testimony, that American Family's practices when reviewing estimated replacement costs were unreasonable or not in keeping with insurance industry standards. *See Philter*, 2011 WL 2750709 at *3 (requiring such expert testimony).

Finally, the fact that American Family changed the minimum coverage amount when the Nelsons complained in early 2011 is not evidence that their previous coverage was based on a "false" replacement cost estimate, or the result of American Family's failure to exercise reasonable care. Missing from the record is evidence as to what an insurer, using reasonable care and 360Value, would estimate as the replacement cost for the Nelson Home from 2007 through 2010. The record similarly lacks any evidence—in the form of expert testimony or industry standards—that a reasonable replacement cost estimate for the Nelson Home could not be approximately $450,000 if one assigned a

360Value quality grade of "above average," or $315,000 if a quality grade of "standard" was used. The Nelsons' experts offer no criticism of any quality grade used by American Family, nor do they directly challenge any of American Family's 360Value replacement cost estimates for the Nelson Home. *See supra* Part I.A.2. American Family's willingness to alter its assessment in early 2011 merely comports with evidence in the record that this was an *estimate* based in significant part on *subjective judgments* about the property—meaning reasonable individuals could disagree about the "correct" or "appropriate" estimated replacement cost. *See supra* Part I.A.1–2.

Upon receiving the Nelsons' complaint in early 2011, American Family decided that $315,000 was within the range of appropriate replacement cost estimates for the Nelson Home and adjusted coverage accordingly. *See supra* Part I.A.5. The precise reasoning behind this decision is not clear from the record—especially since Baker was not deposed—but there is no evidence that it amounted to an admission by American Family that its previous estimates were unreasonable, incorrect, or even the result of a mistake. At most, the decision represents an acknowledgement by American Family that $315,000 was a replacement cost estimate for the Nelson Home it would accept in order to appease the Nelsons.

### 3. Damages

The Nelsons' negligent misrepresentation claim also fails because they suffered no out-of-pocket loss as a result of American Family's alleged misrepresentations. "Minnesota follows the 'out-of-pocket' rule relating to damages in a misrepresentation action. This rule provides that the measure of damages is generally the difference in

value between the amount the plaintiff paid and the value of what the plaintiff actually received." *Driscoll v. Standard Hardware, Inc.*, 785 N.W.2d 805, 811 (Minn. Ct. App. 2010) (citations omitted). "Thus, 'the out-of-pocket rule assumes that plaintiff received something from defendant that was less than what plaintiff anticipated receiving.'" *Kreitzer v. Xethanol Corp.*, No. 08-cv-14 (DSD/JJK), 2009 WL 113373, at *4 (D. Minn. Jan. 16, 2009) (quoting *Autrey v. Trkla,* 350 N.W.2d 409, 412 (Minn. Ct. App. 1984)). "Exceptions to the out-of-pocket rule have been allowed only where the defendant's misrepresentation prevents the plaintiff from taking measures to protect the value of property he already owned." *Id.* at *5.

By operation of the Gold Star policy and Minnesota law—in the event of a total loss—American Family was obligated to pay to the Nelsons at least the full amount of Coverage A they held on the property at the time, regardless of what it cost to actually rebuild the property. *See supra* Part II.B.3. The Nelsons paid premiums based on this coverage and thus there was no "difference in value between the amount the plaintiff[s] paid and the value of what the plaintiff[s] actually received." *See Driscoll*, 785 N.W.2d at 811. Nothing in the record suggests that American Family's estimated replacement cost representations prevented the Nelsons from protecting the value of their home. *See Kreitzer*, 2009 WL 113373 at *5.

### D. Statutory Fraud Claims (Deceptive Trade Practices and False Statement in Advertising)

The Nelsons allege that American Family's conduct in estimating the replacement cost for their home violated Minnesota's statutory prohibitions on deceptive trade

practices and false statements in advertising. (Am. Compl. at ¶¶ 56–68.) Specifically, the Nelsons argue that American Family "misstated" the replacement cost estimate for their home, causing them to be misled regarding the amount of coverage they should maintain on the property. (*Id.* at ¶¶ 58–59.) They contend that American Family "continues to employ its flawed methodology to determine replacement costs," meaning that they "will continue to suffer injury every time they renew [their] Gold Star policy." (*Id.* at ¶ 62.) The Nelsons seek relief in the form of monetary damages along with injunctive and equitable relief, although it is not clear precisely what injunctive or equitable relief they hope to receive. (*Id.* at ¶¶ 63, 68, Prayer for Relief at ¶¶ 4–5.)

Under Minnesota's Deceptive Trade Practices Act ("MDTPA"), an insurer may not engage in a practice whereby it represents that a policy has characteristics it does not, or make other representations that create a likelihood of confusion or misunderstanding. *See* Minn. Stat. § 325D.44, subd. 1(5), (13). "The burden is upon a plaintiff to prove the falsity of the allegedly deceptive statements." *McClure v. Am. Family Mut. Ins. Co.*, 223 F.3d 845, 855 (8th Cir. 2000). If there is no evidence that the statements at issue are "provably false," an MDTPA claim must be dismissed. *Id.* The MDTPA also does not allow for the recovery of monetary damages, with the sole statutory remedy being injunctive relief. *Damon v. Groteboer*, 937 F. Supp. 2d 1048, 1070 (D. Minn. 2013); *Cannon Techs., Inc. v. Sensus Metering Sys., Inc.*, 734 F. Supp. 2d 753, 768 (D. Minn. 2010). A plaintiff's failure to present evidence that he/she faces a risk of future harm requires dismissal of an MDTPA claim. *Damon*, 937 F. Supp. 2d at 1071; *Gardner v. First Am. Title Ins. Co.*, 296 F. Supp. 2d 1011, 1020 (D. Minn. 2003).

Under Minnesota's False Statement in Advertising Act ("MFSAA"), an insurer may not—in connection with the sale or renewal of an insurance policy—use any "fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice" with the intent that others rely on these improper statements. *See* Minn. Stat. §§ 325F.69, 325F.67; *see Parkhill v. Minnesota Mut. Life Ins. Co.*, 995 F. Supp. 983, 997– 98 (D. Minn. 1998) (holding that insurance is "merchandise" under the MFSAA). Misrepresentations made with mere negligence may violate the MFSAA. *301 Clifton Place L.L.C. v. 301 Clifton Place Condo. Ass'n*, 783 N.W.2d 551, 563 (Minn. Ct. App. 2010) ("Liability does not require that the false statement be intentional."); *Church of the Nativity of Our Lord v. WatPro, Inc.*, 474 N.W.2d 605, 612 (Minn. Ct. App. 1991), *aff'd*, 491 N.W.2d 1 (Minn. 1992). Where the plaintiff seeks injunctive relief, there must be evidence that absent this relief the plaintiff will suffer irreparable future harm. *Buetow v. A.L.S. Enterprises, Inc.*, 650 F.3d 1178, 1184–85 (8th Cir. 2011). Moreover, a private plaintiff seeking injunctive relief must prove that he/she suffered past harm or injury-in-fact. *Id.* at 1185. When a plaintiff seeks monetary damages, "it must demonstrate a causal nexus between the improper conduct and the monetary losses alleged." *Taylor Inv. Corp. v. Weil*, 169 F. Supp. 2d 1046, 1062 (D. Minn. 2001). If a plaintiff fails to produce evidence that the statement was a misrepresentation (i.e., false), or evidence that he/she was damaged by the misrepresentation, an MFSAA claim must be dismissed. *See Carlsen v. GameStop, Inc.*, 833 F.3d 903, 912 (8th Cir. 2016); *Swift & Co. v. Elias Farms, Inc.*, 539 F.3d 849, 856–57 (8th Cir. 2008).

The Nelsons' MDTPA and MFSAA claims fail for many of the same reasons previously discussed. First, they have put forward no evidence that American Family's replacement cost estimate for their home from 2007 through 2010 was false. *See supra* Part I.A.1–2, II.B.2, II.C.2. Second, there is no evidence the Nelsons were damaged because they were covered under the Gold Star policy for the full amount of Coverage A each year. *See supra* Part II.B.3, II.C.3. This alone requires dismissal of the Nelsons' statutory fraud claims. *See Swift & Co.*, 539 F.3d at 855–56 (dismissing plaintiffs' MFSAA claim in part because the alleged misrepresentation lead to the plaintiffs receiving more, not less, under the contract); *see also Damon*, 937 F. Supp. 2d at 1070 (monetary damages are unavailable under the MDTPA).

To the extent the Nelsons seek injunctive relief through their MDTPA and MFSAA claims, they fail to present any evidence of future irreparable harm. When the Nelsons complained in 2011, American Family immediately adjusted coverage in accordance with their wishes. *See supra* Part I.A.5. They do not allege that their coverage, or the estimated replacement cost of their home, has been too high since this time. *See id.* In the future, if the Nelsons believe that their coverage is again too high, they may raise the issue with American Family, as they did in 2011. If American Family refused then to adjust their coverage, they would be welcome to cancel their Gold Star policy, or decline to renew it, and obtain insurance elsewhere. Regardless, to the extent the Nelsons might suffer future harm, there is no indication that a monetary award would not fully compensate them, meaning that any harm is not irreparable. *See Richenberg v.*

*Perry*, 73 F.3d 172, 173 (8th Cir. 1995) (denying injunctive relief for lack of irreparable harm where monetary relief would make the plaintiff whole).

### E. Motion for Class Certification

Plaintiffs move to certify several classes consisting of Gold Star policyholders in various states. (*See* Pls.' Class Cert. Mot.) As just described, the individual claims of the named Plaintiffs—the Nelsons—are dismissed. Thus, the Nelsons can no longer represent the class and Plaintiffs' Class Certification Motion must be denied as moot. *In re Milk Prod. Antitrust Litig.*, 195 F.3d 430, 436 (8th Cir. 1999) ("Because Rainy Lake's individual claim was properly dismissed . . . it was not a member of the class and could not represent the class. Because Rainy Lake was the only remaining named plaintiff, the class proposed in the Second Amended Complaint could not have been properly certified." (quotation marks omitted)); *Chavez v. Illinois State Police*, 251 F.3d 612, 630 (7th Cir. 2001) ("[I]if the court determines that the named plaintiffs' claims lack merit, such a decision ordinarily, though not invariably, disqualifies the named plaintiffs as proper class representatives, thus resolving the issue of class certification." (alterations omitted)); *Liebesman v. Competitor Grp.*, No. 4:14-CV-1653 RLW, 2016 WL 204461, at *4 (E.D. Mo. Jan. 15, 2016) (denying plaintiffs' class certification motion as moot after dismissing the named plaintiffs' claims on summary judgment); *Wass v. Dolgencorp, LLC*, No. 6:13-CV-03267-MDH, 2014 WL 5307505, at *5 (W.D. Mo. Oct. 16, 2014) (same). However, dismissal of the Nelsons' claims has no binding effect on any unnamed class member since the dismissal preceded class certification. *See Hartley v. Suburban Radiologic Consultants, Ltd.*, 295 F.R.D. 357, 367 (D. Minn. 2013).

## III.    ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED THAT:**

1.  Defendant's Motion for Summary Judgment on Plaintiffs' Individual Claims [Doc. No. 221] is **GRANTED** and the claims of named Plaintiffs Charles and Darlene Nelson are **DISMISSED WITH PREJUDICE**.

2.  Plaintiffs' Motion to Certify the Class [Doc. No. 208] is **DENIED as moot**.

3.  The various *Daubert* challenges to expert witnesses made by both parties [Doc. Nos. 203, 214, 227, 232] are **DENIED as moot**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: June 26, 2017                    s/ Susan Richard Nelson
                                        SUSAN RICHARD NELSON
                                        United States District Judge